## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

UNITED SOVEREIGN AMERICANS, INC.
167 Lamp and Lantern Village
Suite 194
Chesterfield, MO 63017

  *And*

DIANE HOUSER
205 Santillo Way
Downingtown, PA 19335

  *And*

RUTH MOTON
2250 Blue Ball Avenue
Upper Chichester, PA 19061

  *And*

DEAN DREIBELBIS
1295 Wakefield Court
Glen Mills, PA 19342

    *Petitioners,*

v.

COMMONWEALTH OF PENNSYLVANIA
410 North Street,
Harrisburg, PA 17120

  *And*

AL SCHMIDT, IN HIS OFFICIAL
CAPACITY AS THE SECRETARY OF THE
COMMONWEALTH
410 North Street,
Harrisburg, PA 17120

  *And*

CIVIL ACTION

Case No.: _____

PENNSYLVANIA BUREAU OF
ELECTIONS
401 North Street, Rm 210
Harrisburg, PA 17120

    *And*

PENNSYLVANIA BUREAU OF ELECTION
SECURITY AND TECHNOLOGY
401 North Street, Rm 210
Harrisburg, PA 17120

    *And*

PENNSYLVANIA DEPARTMENT OF
STATE
401 North Street
Harrisburg, PA 17120

    *And*

MICHELLE HENRY, IN HER OFFICIAL
CAPACITY AS THE ATTORNEY
GENERAL OF PENNSYLVANIA
Strawberry Square
Harrisburg, PA 17120

    *And*

PENNSYLVANIA OFFICE OF ATTORNEY
GENERAL
Strawberry Square
Harrisburg, PA 17120

    *And*

MERRICK GARLAND, IN HIS OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
THE UNITED STATES
950 Pennsylvania Avenue NW
Washington DC 20530

    *And*

THE UNITED STATES DEPARTMENT OF
JUSTICE
950 Pennsylvania Avenue NW
Washington DC 20530

*Respondents.*

**PETITION FOR RELIEF IN THE FORM OF A WRIT OF *MANDAMUS*** [1]

*TO: The Honorable, the Judges of Said Court:*

United Sovereign Americans, Inc., a Missouri nonprofit corporation, Diane Houser,

individually, Ruth Moton, individually, and Dean Dreibelbis, individually, Petitioners, by

counsel, van der Veen, Hartshorn, Levin, & Lindheim, through Bruce L. Castor, Jr., Esquire, and

Michael T. van der Veen, Esquire, hereby submits this Petition for Relief in the Form of a Writ of

*Mandamus*, directed to Respondents the Commonwealth of Pennsylvania, Al Schmidt in his

Official Capacity as the Secretary of the Commonwealth, the Pennsylvania Bureau of Elections,

the Pennsylvania Bureau of Election Security and Technology, the Pennsylvania Department of

State, Michelle Henry, in her individual capacity as Attorney General of Pennsylvania, the

Pennsylvania Office of the Attorney General, Merrick Garland, in his official capacity as

Attorney General of the United States, and the United States Department of Justice, and

*Respectfully Represents*:

---

[1] Petitioners are cognizant of Federal Rule of Civil Procedure 81(b) which abolished mandamus actions in United States District Court, but nonetheless authorizes "relief previously available through [writs of mandamus] by appropriate action or motion under these rules." F.R.C.P. 81(b). Petitioners herein are seeking relief via the All Writs Act (§ 1361) and an Action to Compel a United States Officer to Perform His/Her Duty (§ 1361).

## Summary of Petitioners' Argument and Examples of Relief Requested

1.      The Congress of the United States has outlined the minimum standards which must be maintained by every state in order for a federal election to be considered reliable.  As outlined below, in Pennsylvania's 2022 federal election those minimum standards were not met by Commonwealth election officials rendering the certified election results that year unreliable. Respondents in their official capacities engaged in insufficient efforts to ensure that the 2022 performance is not repeated in subsequent federal elections beginning in 2024.

2.      If the 2022 election performance is repeated in 2024, Petitioners and all Pennsylvania voters will suffer damages.

3.      Apart from Court action in equity, no other mechanism exists in the law for Petitioners to require Respondents to perform their ministerial duties requiring that Pennsylvania's federal elections be conducted in conformity with the law as Congress has set forth.

4.      Only this Honorable Court has the power to require Respondents to act to bring the 2024 (and subsequent) federal elections supervised by Pennsylvania authorities into conformity with the minimum standards for reliability set down by Congress and outlined *infra*.

5.      Without the Court's action, Petitioners believe and therefore aver that the 2024 (and subsequent) Pennsylvania federal election results will be unreliable in the same way, and thus unreliable for the same reasons that the 2022 results are unreliable.

6.      Petitioners seek this Court's intervention to ensure that only properly registered voters cast votes in combined federal and state elections beginning in 2024.

7.      Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Pennsylvania elections beginning in 2024.

8.     Petitioners seek this Court's intervention to ensure that all votes properly cast are counted *correctly* in combined federal and Pennsylvania elections in even numbered years beginning in 2024.

9.     Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Pennsylvania elections beginning in 2024.

10.     Petitioners seek this Court's intervention to ensure that all voting systems are compliant with all critical infrastructure requirements and risk assessments are completed within the actual use context, thereby assuring that every ballot is correctly and uniformly processed, as well as accurately tabulated and secured in combined federal and Pennsylvania elections beginning in 2024.

11.     Petitioners seek this Court's intervention to ensure that the authenticity of every ballot counted is proven by the maintenance of a comprehensive, unbroken chain of custody from the voter's hand to the final certified result, and the Commonwealth election officials maintain records of said chain of custody post-election, in compliance with all legally prescribed safeguards in combined federal and Pennsylvania elections beginning in 2024.

12.     Petitioners seek this Court's intervention to ensure that combined federal and Pennsylvania elections in even numbered years beginning in 2024 are conducted with the transparency required by law.

13.     Petitioners seek this Court's intervention to ensure that only votes properly cast are counted in combined federal and Pennsylvania elections beginning in 2024.

14.     Petitioner's seek this Court's intervention clarifying and ordering that the currently accepted Federal definition "to certify" is to attest that an official measurement is both accurate and the finding of accuracy was reaching in a fully compliant manner, thereby, directing

that the "certification of elections" by Commonwealth election officials of combined federal and Pennsylvania elections from 2024 onward constitutes an "attestation," ostensibly under penalty of perjury, by the certifying official(s) that the vote counts are accurate and the cast and counted votes and the election itself were all conducted in compliance with applicable federal and state law.

15.     Petitioners, upon review of the statutes cited below, believe and therefore aver that federal and state law specify what Commonwealth officials must conform to, *at a minimum*, to properly conduct a combined federal and state election and prior certifying that election.

16.     Petitioners believe and therefore aver that based on the analysis below, combined with the various exhibits attached to this petition and incorporated by reference herein, that in the 2022 combined federal and state election, officials of the Commonwealth of Pennsylvania failed to ensure that **safeguards** were in place as mandated by various statutes designed to ensure the integrity of the elections.

17.     Petitioners believe and therefore aver the failure by Commonwealth election officials to know of and implement the safeguards required by law in 2022 allowed Commonwealth election officials to certify that election despite analysis showing the election results were *per se* unreliable on account of apparent error rates exceeding those the law permits before the results in *any* federal election become unreliable.

18.     Petitioners believe and therefore aver that apparent error rates that exceed the maximum error rate allowed by law destroyed the integrity of the 2022 election making full confidence in the accuracy of that election impossible.

19.     While Petitioners cannot state with certainty that the 2022 Pennsylvania General Election produced "winning" candidates who should not have won, Petitioners believe and

therefore aver that the Commonwealth cannot state with certainty that all "winning" candidates received more votes than their "losing" candidates because the election itself was compromised by the Commonwealth's failure to conform to the requirements of federal law designed to ensure reliable election results.

20.     Petitioners believe and therefore aver that Congress mandated the maximum number of election errors which were permissible in the 2022 combined federal and state elections in the Commonwealth (and, indeed, in all states and voting territories).  An error rate above the maximum permissible rate set by Congress renders an election *uncertifiable* because the results are unreliable.  Nevertheless, Commonwealth officials certified the 2022 election.

21.     Petitioners do not seek relief in this Court in a challenge to the outcome of the 2022 federal election in Pennsylvania.  Petitioners agree that it is possible that in every federal contested election supervised and certified by the Commonwealth in 2022 the "winner" received more votes than the "loser."

22.     Petitioners believe and therefore aver, however, that the certification by Pennsylvania officials of the 2022 election was done despite the integrity of the election being suspect on account of *apparent* error rates occurring in that election that exceeded the error rate Congress permits before federal election results cannot be relied upon as accurate, and the Commonwealth did nothing to investigate those apparent errors before certifying the election.

23.     **Petitioners believe and therefore aver that it is reasonable to believe that systemic issues which occurred in the 2022 combined Federal and state election in Pennsylvania will continue uncorrected in 2024, 2026, 2028, etc. absent intervention by this Court.**

24.     Petitioners aver they have called the various issues with the 2022 election to the attention of Commonwealth officials who failed to take sufficient action to ensure no further repeats of those issues cited here affecting the integrity of the 2022 election.

25.     The relief requested by Petitioners in the form of a Writ of *Mandamus* seeks, broadly speaking, this Court order Respondents to perform the *ministerial* functions their jobs require by taking actions to rectify reliability issues evident in the 2022 election.[2]

### 2022 Combined Federal and State Election in Pennsylvania Produced Unreliable Results and Should Not Have Been Certified

26.     In the Help America Vote Act ("HAVA") 52 US.C.A. § 21083, **Congress mandates as follows: HAVA - voting system error rate "…(5) Error RATES.—The error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system and not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting systems standards issued by the Federal Election Commission ("FEC") which are in effect on the date of the enactment of this Act."**

27.     Congress enacted and President Bush signed HAVA into law in 2002 and it remains the law of the United States to date.

28.     The voting standards of the FEC in effect at the time Congress enacted HAVA in 2002 were the Voting Systems Standards Volume I: Performance Standards (2002).[3]

---

[2]     Petitioners do not request this Court order Respondents to exercise their *discretion* or make any decision at all apart from enforcing the specific, non-discretionary, requirements of the law outlined *inter alia* below.

[3] As of 2021, there have been five iterations of national level voting system standards. The Federal Election Commission published the first two sets of federal standards in 1990 and 2002 (VSS1990 and VSS2002). The Election Assistance Commission then adopted Version 1.0 of the Voluntary Voting System Guidelines (VVSG 1.0, or VVSG2005) on December 13, 2005. On March 31, 2015, the EAC commissioners approved VVSG 1.1 (VVSG2015). On February 10, 2021, the EAC approved VVSG 2.0 (VVSG2021).

29.     **Those voting standards, in effect at the time HAVA became law, allowed for one error per 10 million ballot *positions*.**

30.     Plaintiffs believe and therefore aver that a federal election that exceeded an error rate of one error per 10 million ballot *positions* renders a federal election unreliable.

31.     As the HAVA provision enacted in 2002 cited above has not changed, the error rate of one error per 10 million ballot *positions* is currently the law of the United States.

32.     A "ballot *position*" refers to the number of individual "choices" a voter could make on a single ballot.  For example, if a particular ballot has thirty little circles for the voter to fill-in or not fill-in, that single ballot would be said to contain thirty ballot positions.

33.     A voting system error occurs anytime the voting scanning machine should have discerned an error, not made by the voter, while counting one of those ballot positions on a scanned ballot.

34.     Experts working for the FEC estimated that 10 million ballot *positions* equaled 125,000 *individual ballots*. (See Federal Election Commission Voluntary Voting System Guidelines of 2015, *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf)

35.     Petitioners believe and therefore aver that the FEC desired to clarify the meaning of 10 million ballot *positions* in terms of how many individual ballots "make-up" 10 million ballot *positions* in order to make easier understanding the election "error rates" permissible by HAVA.

36.     Petitioners believe and therefore aver (and will present expert testimony to so substantiate) that the calculation made by the FEC that 10 million ballot positions represents

125,000 individual ballots is correct and represents the proper interpretation of federal law and Congressional intent under HAVA.

37.     In the 2022 Pennsylvania General Election, 5,410,022 individual ballots were recorded by election officials as cast.

38.     For the 2022 General Election if 5,410,022(ballots cast) is divided by 125,000 (because the law allows for one error per 125,000 ballots), that leaves forty-four (44) (rounded up) as the maximum number of errors permitted under federal law for that election.  Only upon a showing of 44 of fewer errors, then, would HAVA permit Commonwealth election officials to certify the 2022 election as valid.

39.     If there were more than forty-four (44) voting system errors in the entire ballot tabulation for all ballots cast in the 2022 election in Pennsylvania, the election results are unreliable.

40.     Pennsylvania exceeded this benchmark of forty-four (44) voting system errors in the 2022 General Election as outlined below.

41.     Petitioners believe and therefore aver that contributing to the unreliability of the Commonwealth's 2022 election is the fact that Pennsylvania's voter registration rolls, themselves, contained *hundreds of thousands* of potential errors at the time of the 2022 General Election.

42.     These potential errors were in the form of illegal duplicate registrations, voters with invalid or illogical voter history, voters placed in inactive statuses on questionable authority, backdated registrations, registrations with a modified date prior to registration, invalid or illogical registration dates, age discrepant registrants, and registrants with questionable addresses.

43.     Such errors jeopardize the validity of elections throughout the Commonwealth, bring doubt as to the accuracy and integrity of the Commonwealth's currently-in-place voting systems, undermine Pennsylvanian's collective voting rights, all in violation of existing state and federal election laws.

44.     Petitioners seek redress from these voter registration apparent errors, relief from blatantly inaccurate voter registration rolls, relief from discrepancies between votes cast and actual votes reported, and relief from extreme voting errors generally, which collectively and historically amount to violations of federal election laws, Pennsylvania election laws, and various voting rights encompassed by the United States Constitution.

45.     The aforesaid violations of federal and state law have in the past resulted in the certification of election results from provably flawed, inaccurate, and obscure processes outside the view of impartial witnesses or the public, and Respondents have refused collectively to maintain or enforce compliance with federal and state required transparency mandates.

46.     Petitioners have brought this issue to the attention of Respondents, who have done absolutely nothing to address these errors ensuring future elections will suffer from the same deficiencies.

47.     Furthermore, rather than alarmed by these apparent errors pursuant to prevailing election laws, Respondents instead have collectively ignored the issue of the unreliable election results therefore produced.

48.     Petitioners believe and therefore aver Respondents have failed to adequately police and monitor problems with the voter rolls and failed to adequately fix voting registration errors within the Commonwealth, despite being in the best position to ensure the reliability,

integrity, and accuracy of Pennsylvania's elections to ensure veracity of the Commonwealth's election results.

49.     Petitioners have repeatedly made good faith and sincere efforts to negotiate and get Respondents to respond to their legitimate concerns.

50.     Petitioners have repeatedly shown Respondents evidence of potential violations of election law, regarding the conduct of elections by local and state officials charged with administering elections, on behalf of all citizens in accordance with the law.

51.     The risk of election subversion is indisputable, but the Commonwealth has denied Petitioners denied a fair hearing, despite the serious nature of Petitioners' findings calling into question the reliability, integrity and accuracy of prior federal elections administered by the Commonwealth.

52.     The prayer for relief seeks the protection of Petitioner's rights, as well as those of every voting citizen of the Commonwealth, to have their vote fairly counted in an open and reliable election as such elections are defined according to law as outlined below.

53.     Respondents have denied Petitioners' their right to a fair vote.

54.     Furthermore, Respondents appear to have followed procedures that have obscured the ability to audit the 2022 general election to render the outcomes factually unknowable, at the time of certification.

55.     Petitioners believe and therefore aver Respondents have violated multiple federal and state laws, or negligently allowed such violations to occur, while loudly proclaiming the infallibility of the Commonwealth's election results.

56.     Respondents insist that Petitioners have adequate voting rights, while simultaneously fighting from every conceivable angle to prevent Petitioners from attempting to

protect those rights. Respondents' collective actions in refusing to address the problem

extinguishes and undermines the very meaning of the right to vote in a fair democracy.

57.      Respondents can and should be compelled to address compliance with existing

election law, specifically: compelled to adequately investigate the issue, prosecute anyone in

violation of federal and/or state law, and actively work to bring the Commonwealth back into

compliance with federal and state election law mandates so that Pennsylvania's constitutionally

enshrined voting rights are upheld and preserved.

58.      The All-Writs Act, 28 U.S.C. § 1651 provides that "[t]he Supreme Court and all

courts established by Act of Congress may issue all writs necessary or appropriate in the aid of

their respective jurisdictions and agreeable to the usages and principles of law."

59.      District Courts of the United States have original jurisdiction of any action in the

nature of *mandamus* to compel an officer or employee of the United States or any agency thereof

to perform a duty owed to the plaintiff. 28 U.S.C. § 1361.

## Parties

60.      United Sovereign Americans, Inc., is a nonprofit corporation incorporated in the

state of Missouri.

61.      Diane Houser is an individual with the address of 205 Santillo Way,

Downingtown, PA 19335.

62.      Ruth Moton is an individual with an address of 2250 Blue Ball Ave, Upper

Chichester, PA 19061. Ruth Moton was a candidate for state representative in 2018, 2020, and

2022.

63.      Dean Dreibelbis is an individual with an address of 1295 Wakefield Court, Glen

Mills, PA 19342.

64.     The Commonwealth of Pennsylvania is a government entity.

65.     Al Schmidt, in his official capacity as the Secretary of the Commonwealth, was appointed by the Governor to oversee the Department of State. He and his department are tasked with administering and ensuring the Commonwealth's compliance with Pennsylvania's Election Code, the Commonwealth's compliance with federal law – namely the Help America Vote Act, and the National Voter Registration Act.

66.     The Pennsylvania Bureau of Elections is a government entity responsible for administering and ensuring the Commonwealth's compliance with Pennsylvania's Election Code and the Commonwealth's compliance with federal law – namely the Help America Vote Act, and the National Voter Registration Act.

67.     The Pennsylvania Bureau of Election Security and Technology is a government entity responsible for administering and ensuring the Commonwealth's compliance with Pennsylvania's Election Code and the Commonwealth's compliance with Federal Law – namely the Help America Vote Act and the National Voter Registration Act.

68.     The Pennsylvania Department of State is a government entity responsible for administering and ensuring the Commonwealth's compliance with Pennsylvania's Election Code and the Commonwealth's compliance with federal law – namely the Help America Vote Act, and the National Voter Registration Act.

69.     Michelle Henry, in her Official Capacity as the Attorney General of Pennsylvania, is responsible for overseeing and managing the Office of the Attorney General of Pennsylvania which is a government agency tasked with the enforcement and prosecution of state law in addition to ensuring that state actors, including those acting within the Pennsylvania Department of State, are complying with Pennsylvania law.

70.     The Pennsylvania Office of the Attorney General is a government agency tasked with the enforcement and prosecution of state law in addition to ensuring that state actors, including those acting within the Pennsylvania Department of State, are complying with Pennsylvania law.

71.     Merrick Garland, in his Official Capacity as the Attorney General of the United States, is the chief law enforcement official in the United States, and is responsible for overseeing and managing the Department of Justice of the United States which is a government agency tasked with the enforcement and prosecution of federal law in addition to ensuring that state and federal actors, including those acting in the various states within the United States, are complying with Federal law.

72.     The United States Department of Justice is a government agency tasked with the enforcement and prosecution of federal law, in addition to ensuring that state actors, including those acting within the Commonwealth of Pennsylvania, are complying with federal law.

**Jurisdiction and Venue**

73.     This Court has jurisdiction pursuant to 28 U.S.C. § 1651.

74.     This Court has jurisdiction pursuant to 28 U.S.C. § 1361.

75.     This Court additionally has subject matter jurisdiction over this complaint because the case presents substantial questions of federal law, and the state claims are so related to the federal claims that they form part of the same case or controversy. 28 U.S.C. §§ 1331 and 1367.

76.     This Court has personal jurisdiction as the Respondents are a collection of Commonwealth of Pennsylvania agencies and actors, and the Commonwealth of Pennsylvania is within the jurisdiction of the United States.

77.    "When a state exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Gray v. Sanders*, 372 U.S. 368 (1963); *Gomillion v. Lightfoot*, 364 U.S. 347 (1960).

78.    Venue is proper in this district under 28 U.S.C. § 1391(e)(1).

**Standing**

79.    Petitioner Diane Houser is a citizen of Pennsylvania, Chester County, and voted in the 2020 and 2022 elections. In 2022, she discovered that her vote was not recorded in Pennsylvania's Statewide Uniform Registry of Electors ("SURE") system, even though she had voted in person.

80.    Petitioner Diane Houser also reported numerous issues to authorities and was ignored numerous times. She was furthermore not successful in obtaining information pursuant to a valid Right to Know Request. *See* Exhibit "E" for a document regarding Ms. Diane Houser's efforts to improve election security and complaints to authorities.

81.    Petitioner Ruth Moton is a citizen of Delaware County, Pennsylvania and was a candidate for Pennsylvania State Representative in the 2018, 2020, and 2022 election seasons.

82.    In addition to the lengthy number of hours spent campaigning, Petitioner Ruth Moton's campaign spent $10,775.15 during the 2018 election, $4,412.92 in the 2020 election, and $17,496.59 in the 2022 election. Due to Pennsylvania's inaccurate voting registration rolls, Petitioner Ruth Moton has injury in that she spent money on a campaign where she could not be certain of the location and identity of the voters she was attempting to canvas. *See* Exhibit "F" for a copy of Petitioner Ruth Moton's campaign finance expenses.

83.   Petitioner Dean Dreibelbis is a citizen of Pennsylvania, Delaware County, who observed and reported numerous election issues, apparent errors, loopholes, and discrepancies to authorities and was, each time, ignored. *See* Exhibit "G" for Dean Dreibelbis's efforts to improve election security.

84.   A candidate for the Pennsylvania State Senate, Mr. Mike Miller, of Lancaster, Pennsylvania, though not a named Petitioner herein, also experienced and fell victim to numerous registration issues in the 2022 election season. These issues, included, but were not limited to:

a.   On election day, Lancaster County announced that approximately 14,000 of the 22,000 ballots it received from 'mail-in' voters could not be counted by County's scanners because the ballots had been misprinted. (County's clerk testified that 8,000 ballots scanned without error);

b.   Some ballots received from voters in Senate District 36 did not have Miller's contest printed on the ballot, therefore those voters were unable to vote for Miller;

c.   On May 17, 2022, Lancaster County's board directed the County's employes to procure and mark 14,000 'replacement' mail-in ballots and to count these instead of the ballots returned by voters;

d.   Lancaster County reported the count of the replacement ballots instead of the ballots completed by voters; and

e.   Lancaster County repeatedly frustrated Mr. Miller from accessing the ballots as required by law.

85.    Audit The Vote PA, a non-partisan, non-profit organization organized in the Commonwealth of Pennsylvania, though not a named petitioner herein, also uncovered overwhelming evidence of registration issues in the 2020 and 2022 elections. In particular, they discovered that for the 2022 election:

  a.  6,433 registrations were credited as voting, but no information was listed for vote date, 2022 election party, or 2022 election vote method;

  b.  In Pennsylvania, 54,463 people voted in a county in which they were no longer living;

  c.  In Pennsylvania, 8,177 people voted despite not actually living in Pennsylvania;

  d.  6,356 people were credited as submitting a mail-in ballot, but did not have any votes credited in Pennsylvania's SURE system;

  e.  644 people voted by mail or absentee ballot, but are not on the mail ballot list;

  f.  138 people voted by mail, but they had missed the deadline to vote by mail-in ballot;

  g.  69,832 mail ballots were sent to an address unaffiliated with the voter's registration;

  h.  5,914 people requested a mail ballot, who do not exist on the PA voter rolls between 10/3/2022 and 1/16/2023;

  i.  18,589 people requested multiple ballots be sent to multiple addresses, with some people requesting additional ballots to be sent to up to four (4) separate addresses; and

j.   5,492 registrations show as having two votes on record in two separate
counties.

*See* Exhibit "H" for documents from Audit The Vote PA regarding election integrity.

86.    There is active litigation in this Commonwealth concerning Pennsylvania's
compliance with the Help America Votes Act ("HAVA"), in that certain Commonwealth
directives violate United States federal election law. *See* Exhibit "I" for a copy of the Complaint
in the matter *McClinko v. Commonwealth of Pennsylvania, et al.*

87.    There is active litigation in the Third Circuit Court of Appeals concerning
Pennsylvania's non-compliance with the National Voter Registration Act ("NVRA"), in that the
Commonwealth has failed to satisfy the Commonwealth's disclosure obligations under the
NVRA. *See* Exhibit "J" for a copy of the Appellee/Cross-Appellant Brief in the matter *Schmidt v.
Public Interest Legal Foundation, Inc.*, United States Court of Appeals for the Third Circuit
(Nos. 23-1590 and 23-1591).

88.    Petitioners have been and are currently harmed by the Commonwealth of
Pennsylvania voting systems currently and formerly in use in the Commonwealth of
Pennsylvania state and federal elections. Respondents have allowed, and continue to allow,
violations of federal election laws, Pennsylvania election laws, the United States Constitution,
and federal civil rights laws pertaining to voter rights.

89.    The violations of Commonwealth of Pennsylvania election laws, federal election
laws, the U.S. Constitution, and federal civil rights laws pertaining to voter registration rolls,
transparency, compliance, and certification of the voting systems, and the serious issues
hereinafter discussed with the overall voting systems exemplify their injury.

90.     The injury to Petitioners and all Pennsylvania voters would cease to exist or be greatly relieved if the Court grants Petitioners' requested relief.

91.     The Supreme Court has indicated that if one party to a lawsuit has standing, other entities can join as parties without having to independently satisfy the demands of Article III, provided those parties do not seek a distinct form of relief from the party with standing. *E.g., Horne v. Flores*, 557 U.S. 433 (2009).

92.     United Sovereign Americans is not seeking a distinct form of relief from the other Petitioners and therefore has standing.

**Background**

## A.  THE CONSTITUTIONALLY PROTECTED RIGHT TO VOTE

93.     The United States Constitution grants the people the right to choose representatives to the people of several states, according to the voting eligibility requirements of the state. U.S. Const. art. 1, § 2.

94.     The 14th Amendment of the United States Constitution, Section 1, defines a "citizen" as all people born or naturalized in the United States and subject to the jurisdiction thereof.

95.     The 14th Amendment of the United States Constitution, Section 2, protects eligible citizen voters against denial or abridgment of their vote.

96.     "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 1 Cranch 137, 5 U. S. 163 (1803).

97.     Federal courts regard the right to vote in a fairly conducted election as a constitutionally protected feature of United States citizenship. *Reynolds v. Sims*, 377 U.S. 533 (1964).

98.     After the 2020 Presidential Election, pervasive discussion reported on by the media focused on the validity of the presidential election results within the Commonwealth of Pennsylvania.

99.     Discussions and/or litigation in Pennsylvania, as well as in other states around the Nation, centered on whether raw vote totals were accurate, with particular attention focused on the question: if all ballots in dispute were decided, hypothetically, in the favor of one candidate for president over the other, would that have changed the *outcome* of the election in that state?

100.    Questions concerned whether the recorded vote totals, viewed in the light most favorable to the losing candidate in any given state, could have affected the awarding of electoral votes from said state, which, in turn, might have affected the determination of the "winner" of the elections for president and vice-president in the Electoral College.

101.    The media widely reported that no court ruled that, even if all disputed ballots were assumed to have been found to be favorable to the Republican Candidate during the 2020 presidential election, the outcome in any disputed state would not have been affected. Furthermore, there was insufficient evidence produced such that a court could find that the outcome of the election in any disputed state was unreliable.

102.    Petitioners do not seek to revisit the results of the 2020 presidential election, nor to re-examine the conclusions drawn by the various courts and media outlets as summarized at averment 101 above.

103.    Petitioners posit a different question than that noted in averment 99: ***How many disputed ballots found to be improperly cast in any given federal election may occur before the reliability and integrity of the entire election becomes suspect?*** Petitioners respectfully represent that Congress has answered this very question as outlined further below and Congress' answer to this question forms much of the basis of the instant Petition.

104.    In *In re: Coy*, 127 U.S. 731 (1888), the United States Supreme Court held that Congress had authority under the Constitution's Necessary and Proper Clause to regulate any activity during a mixed federal/state election that exposed the federal election to potential harm, whether that harm materialized or not. Coy is still good law. *United States v. Slone*, 411 F.3d 643, 647 (6th Cir. 2005); *United States v. Mason*, 673 F.2d 737, 739 (4th Cir. 1982); *United States v. Malmay*, 671 F.2d 869, 874–75 (5th Cir. 1982); *Ex parte Yarborough*, 110 U.S. 651 (1884); *Ex parte Siebold*, 100 U.S. 371 (1880).

105.    In *Oregon v. Mitchell*, 400 U.S. 112 (1970), the Supreme Court stated:

> "The right to vote is, of course, different in one respect from the other rights in the economic, social, or political field which, as indicated in the Appendix to this opinion, are under the Equal Protection Clause. The right to vote is a civil right deeply embedded in the Constitution. Article I, § 2, provides that the House is composed of members 'chosen . . . by the People' and the electors 'shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature.' The Seventeenth Amendment states that Senators shall be 'elected by the people.' The

Fifteenth Amendment speaks of the 'right of citizens of the United

States to vote' -- not only in federal but in state elections.

* * *

[T]he right to vote freely for the candidate of one's choice is of the

essence of a democratic society, and any restrictions on that right

strike at the heart of representative government. This 'right to

choose, secured by the Constitution,' *United States v. Classic*, 313

U. S. 299, is a civil right of the highest order. Voting concerns

'political' matters; but the right is not 'political' in the constitutional

sense. Interference with it has given rise to a long and consistent line

of decisions by the Court; and the claim has always been upheld as

justiciable . . . as the right in the people of each State to a republican

government and to choose their Representatives in Congress is of

the guarantees of the Constitution, by this amendment a remedy

might be given directly for a case supposed by *Madison*, where

treason might change a State government from a republican to a

despotic government, and thereby deny suffrage to the people."

106.   The Supreme Court of the United States further stated: "we are cautioned about

the dangers of entering into political thickets and mathematical quagmires. Our answer is this: a

denial of constitutionally protected rights demands judicial protection; our oath and our office

require no less of us." *Reynolds v Sims*, 377 U.S. 533 (1964).

107.   "Every voter in a federal . . . election . . . whether he votes for a candidate with

little chance of winning or for one with little chance of losing, has a right under the Constitution

to have his vote fairly counted, *without its being distorted by fraudulently cast votes.*" *Anderson v. United States,* 417 U.S. 211, 227 (1974) (emphasis added).

### B.   NATIONAL VOTER REGISTRATION ACT ("NVRA")

108.    The National Voter Registration Act ("NVRA") was passed for the purpose of ensuring accurate and current voter registration rolls to enhance the integrity of elections.

109.    In so doing, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 US.C.A. § 20501.

110.    The NVRA exists in part to "protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained." 52 US.C.A. § 20501.

111.    The NVRA *requires* states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters" by reason of death or change of address. 52 U.S.C. § 20507(a)(4).

112.    Similarly, the U.S. Election Assistance Commission ("EAC") is required by law to report to Congress its findings related to state voter registration practices. 52 U.S.C. § 20508(a)(3).

113.    Federal regulations require states to provide data to the EAC for use in their reports, including the numbers of active voters, and the numbers of registered voters removed from the rolls for any reason. 11 C.F.R. § 9428.7(b)(1), (2), (5).

114.    The NVRA requires the States to complete any program the purpose of which is to remove ineligible voters from the official lists of eligible voters not later than ninety (90) days prior to an election.

115.    NVRA has two (2) methods of enforcement. First, the Attorney General can petition the court for declaratory and injunctive relief. Second, a private citizen can pursue a cause of action with certain requirements as follows. In a private action, notice is required, in that a person must notify the chief election official of the State involved. If the violation is not corrected within 90 days of receipt of the notice or within 20 days after receipt of the notice, if the violation occurred within 120 days before the date of an election for office, the aggrieved person may bring a civil action in an appropriate district court seeking relief. In the alternative, if the violation occurs 30 days before the date of an election for federal office, no notice is required.

116.    Although the NVRA authorizes a private cause of action in the form of declaratory or injunctive relief, this "remedy" is largely toothless. Any Court in the United States would have great reluctance to formally order election officials to correct the NVRA error and/or decertify an election so close in time to an actual election or just after certification.

117.    Additionally, to what extent the NVRA requires a hypothetical plaintiff to have suffered injury is not clear – standing could be a troublesome burden to prove particularly if the harm, such as voter fraud and dilution, has been committed on a class people, the electors as a whole, rather than on an individual person.

118.    Furthermore, a Court could attempt to use the doctrine of laches to avoid the distasteful task of questioning election officials, inquiring into potentially fraudulent elections,

and inaccurate voting rolls, despite a hypothetical plaintiff being in full compliance with the private NVRA notice requirements.

119.    Congress's power to pass the NVRA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voter rolls a requirement to uphold the right of the people to choose their representatives.

**C.  HELP AMERICA VOTE ACT ("HAVA")**

120.    The Help America Vote Act ("HAVA") exists in part to "establish minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections, and other purposes." 52 US.C.A. § 21083.

121.    HAVA requires that voter roll databases contain only the registrations of qualified citizen voters residing in that state. 52 US.C.A. § 21083(a).

122.    HAVA defines a voting system as "the total combination of mechanical, electromechanical, or electronic equipment (including software, firmware, and documentation required to program, control, and support the equipment) that is used to define ballots; to cast and count votes; to report or display election results; and to maintain and produce any audit trail information." 52 US.C.A. § 21083.

123.    The purpose of any voting system is to accurately record, store, consolidate, and report the specific selections, and absence of selections, made by the voter as well as to accurately measure the intent of the total body of eligible voters that voted.

124.    Voter registration is encompassed in the definition of a voting system defined in HAVA because a voting system includes the documentation required to program the voting machines and to "cast and count votes." 52 US.C.A. § 21081(b).

125.    Petitioners believe and therefore aver the ability to "cast and count votes" begins with establishing eligibility and registering only qualified citizens into voter registration databases, thus assuring that all ballots granted, cast, and counted, are lawful.

126.    Petitioners believe and therefore aver that inaccurate voter rolls have significant negative consequences in elections.

127.    As voter registration is included by definition under the law as part of the voting system, it is subject to the allowable or not allowable error rates of voting systems as set forth in HAVA. 52 US.C.A. § 21081(a)(5). (The number of errors allowed using the one error per 125,000 ballots formula in the Pennsylvania General Election explained, *supra*., Petitioners suggest therefore applies to registrations).

128.    Per HAVA, in any given state, each qualified voter is granted a unique statewide identifier in a database, which averts the risk of double-voting or extra ballots being cast in the name of one individual voter.

129.    HAVA furthermore requires that federal elections adhere to an accuracy standard, "…*set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections*." United States (2002) *U.S. Federal Election Commission FEC*. United States [Web Archive] Retrieved from the Election Assistance Commission, https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf (emphasis added).

130.    Accuracy in a voting system is defined as the ability of the system to capture the intent of voters without error. United States. (2002) *U.S. Federal Election Commission FEC*.

United States [Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/Voting_System_Standards_Volume_I.pdf

131.     Section 301 of HAVA regarding "Voting System Standards," states that the "error

rate of [a] voting system in counting ballots . . . shall comply with the error rate standards

established under section 3.2.1 of the voting systems standards issued by the Federal Election

Commission." 52 US.C.A. § 21081(a)(5).

132.     Petitioners ask this court recall that, the FEC voting systems standards of section

3.2.1 establish that "the system shall achieve a target error rate of no more than **one in

10,000,000 ballot positions, with a maximum acceptable error rate in the test process of one

in 500,000 ballot positions.**" See *supra*. at 30.

133.     The Voluntary Voting System Guidelines ("VVSG"), Version 1.1, Section 4.1.1 –

Accuracy Requirements state, in part, **"[a]ll systems shall achieve a report total error rate of

no more than one in 125,000."** Furthermore, "[t]he benchmark of one in 125,000 is derived

from the 'maximum acceptable error rate' used as the lower test benchmark in the 2005

Voluntary Voting System Guidelines Version 1.0. That benchmark was defined as a ballot

position error rate of one in 500,000. The benchmark of one in 125,000 is expressed in terms of

votes, however, it is consistent with the previous benchmark that the estimated ratio of votes to

ballot positions is ¼." United States (2015) *U.S. Election Assistance Commission.* United States

[Web Archive] Retrieved from the Election Assistance Commission,

https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf. [4]

---

[4]     In the latest version of the VVSG, or VVSG 2.0, the EAC adopted the position that "the value of
10,000,000 ballot positions is taken from VVSG 1.0 [VVSG2005], however it is used here as the minimum number
of ballot positions to test without error. *If a larger number of ballot positions is used, there still can be no error.*"
(emphasis added).

134.    HAVA also requires that states who receive payments for the administration of elections must use the funds "in a manner consistent with each of the laws described in Section 21145 . . . and the proposed uses are not inconsistent with the requirements of Title III." 52 U.S.C. § 20971(c).

135.    A private cause of action may exist for HAVA through 42 U.S.C. § 1983. *Colon-Marreror v. Velez*, 813 F.3d 1, 22 (1st Cir. 2016) (finding a private action under 1983 for HAVA violations because the provision provided enforceable voting rights and imposes binding obligations on state officials).

136.    Section 1983 provides a mechanism for enforcing individual rights secured elsewhere as in rights independently secured by the Constitution and laws of the United States. *Gonzaga University v. Doe*, 536 U.S. 273 (2002). Importantly, a §1983 plaintiff must assert a violation of a federal right, not just a law. *Blessing v. Freestone,* 520 U.S. 329 (1997).

137.    A private cause of action pursuant to §1983 can be found for violations of HAVA Section 301, which requires voting systems to provide the voter with the opportunity to change the ballot or correct any apparent error before the ballot is cast and counted. 52 USC 21081(a)(1)(A)(ii). The violation could be produced by a configuration of the voting machines.

138.    Section 1983 is currently the only mechanism where HAVA violations will receive any meaningful private review, yet it has proven thus far to be ineffectual at providing any real remedy for HAVA violations.

139.    Congress's power to pass the HAVA comes from Article I, Section 8, Clause 18 of the United States Constitution, the Necessary and Proper Clause, making accurate voting systems a requirement to uphold the right of the people to choose their representatives.

## PENNSYLVANIA ELECTION CODE

140.    Pennsylvania law requires that the Department of State establish a Statewide Uniform Registry of Electors known as the "SURE" system. 25 PA. C.S. § 1222(a).

141.    Per 25 PA. C.S. § 1222(c), the SURE system, among other things, is required to do the following:

a.   Contain a database of all registered electors;

b.   Ensure the integrity and accuracy of all registration records in the system;

c.   Assign a unique SURE registration number to each individual currently registered in Pennsylvania;

d.   Permit auditing of each registered elector's registration record from the day of creation until the day of cancellation;

e.   Permit the department to implement section 1901(b)(1) (relating to removal of electors);

f.   Identify the election district to which an elector is assigned;

g.   Identify duplicate voter registrations on a countywide and Statewide basis; and

h.   Identify registered electors who vote in an election and the method by which their ballots were cast.

142.    The Secretary of the Commonwealth is required to promulgate regulations necessary to establish, implement, and administer the SURE system. 25 PA. C.S. § 1222(f).

143.    The Secretary of the Commonwealth may promulgate reasonable regulations governing access to public information lists. 25 PA. C.S. § 1404(b).

144.    The election code describes numerous criminal penalties for failing to adhere to basic code guidelines:

     a.  Intentional False Statement on a Voter Application. 25 PA. C.S. § 1322(a) (prosecuted as Perjury (18 Pa. C.S. § 4902), False Swearing (§ 4903), or Unsworn Falsification (§ 4904)).

     b.  Disobeying a Lawful Order of a Registration Commission. 25 PA. C.S. § 1701.

     c.  Improper Registration. 25 PA. C.S. § 1702(a).

     d.  Refusal to Register a Qualified Elector. 25 PA. C.S. § 1702(b).

     e.  Applying for Registration With Knowledge That The Individual Is Not Entitled to Registration, Faulty Change of Address, or Intentionally Impersonating Another in an Application. 25 PA. C.S. § 1703(a).

     f.  Altering a Registration. 25 PA. C.S. § 1704.

     g.  Knowingly Refusing a Vote or Accepting a Fraudulent Vote. 25 PA. C.S. § 1705.

     h.  Intentionally Refusing to Perform an Election Duty. 25 PA. C.S. § 1706.

     i.  Intentionally Inserting, Altering, or Removing SURE System Data Not In Accordance with The Pennsylvania Election Code. 25 PA. C.S. § 1707.

     j.  Withholding Information. 25 PA. C.S. § 1708.

     k.  Failure of Law Enforcement To Assist Commissioners or the Secretary of the Commonwealth. 25 PA. C.S. § 1709.

     l.  Interference with Election Code Duties. 25 PA. C.S. § 1710.

     m.  Preventing Registration. 25 PA. C.S. § 1711.

n.   Maliciously Fail to Register. 25 PA. C.S. § 1712.

o.   Solicitation of Registration Based On Financial Incentive. 25 PA. C.S. § 1713.

145.    Importantly, the Pennsylvania Department of State has the authority to take "any actions" including the authority to audit registration records of a county commission. 25 PA. C.S. §1803.

146.    Pennsylvania law requires each county registration commission to institute a program to "protect the integrity of the electoral process," "ensure the maintenance of accurate and current registration records," and "identify registered electors whose address may have changed." 25 PA. C.S. § 1901(a), (b).

147.    Petitioners believe and therefore aver that the Commonwealth cannot demonstrate effective control over voter eligibility in conformity with federal or state requirements, and the Commonwealth has implemented a system that does not guarantee accuracy or compliance with legal mandates requiring the Commonwealth to ensure that only eligible voters may register and vote.

**D.   ELECTION FRAUD CONGRESS SOUGHT TO GUARD AGAINST**

148.    Petitioners do not accuse any person or entity of engaging in election fraud in 2022, nor propose any person or entity will engage in such fraud in 2024 or in subsequent federal elections in Pennsylvania.  Petitioners' purpose in describing types of voter fraud is to set forth the harms Congress sought to avoid by implementation of HAVA and NVRA as well as the various statutes passed by the Pennsylvania General Assembly and cited above.

149.    Petitioners believe and therefore aver election fraud can occur in multiple diverse ways, not all of which are individualized to a specific actor.

150.    Petitioners believe and therefore aver over the past fifty years, Congress has enacted criminal laws with broad jurisdictional basis to combat false voter registrations, vote-buying, multiple-voting, and fraudulent voting in elections in which a federal candidate is on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511.

151.    The federal jurisdictional predicate underlying these statutes is satisfied as long as either the name of a federal candidate is on the ballot, or the fraud involves corruption of the voter registration process in a state where one registers to vote simultaneously for federal as well as other offices. *Slone*, 411 F.3d at 647–48; *United States v. McCranie*, 169 F.3d 723, 727 (11th Cir. 1999).

152.    Voting in federal elections for individuals who do not personally participate in, and assent to, the voting act attributed to them, or impersonating voters, or casting ballots in the names of voters who do not vote in federal elections, can constitute prosecutable election fraud. *See* 52 U.S.C. §§ 10307(c); 10307(e); 20511(2).

153.    It is *possible* for election officials acting "under color of law" to commit election fraud by performing acts such as diluting ballots with invalid ones (ballot stuffing), rendering false tabulations of votes, or preventing valid voter registrations or votes from being given effect in any election, federal or non-federal (18 U.S.C. §§ 241, 242), as well as in elections in which federal candidates are on the ballot. *See* 52 U.S.C. §§ 10307(c), 10307(e), 20511(2).[5]

---

[5]    For purposes of the present Petition, Petitioners do not suggest any Pennsylvania election officials engaged in election fraud.  Rather, Petitioners' point out the *possibility* of improper conduct by election officials as a harm against which Congress and the General Assembly have sought to guard by enacting the various statutes cited here. A reason Congress, especially in HAVA, set forth standards that must be met before an election is considered reliable is to counter potential election fraud and to thus produce presumptively reliable election results.

154.     An individual commits election fraud by submitting fictitious names to election officers for inclusion on voter registration rolls, thereby qualifying the fictious name to vote in federal elections. 52 U.S.C. §§ 10307(c), 20511(2).

155.     An individual commits election fraud by knowingly procuring eligibility to vote for federal office by people who are not entitled to vote under applicable state law and/or people who are not United States Citizens. 52 U.S.C. §§ 10307(c), 20511(2); 18 U.S.C. §§ 1015(f).

156.     An individual who makes a false claim of United States Citizenship to register to vote commits election fraud. 18 U.S.C. § 1015(f); 18 U.S.C. § 911.

157.     A person who provides false information concerning a person's name, address, or period of residence in a voting district to establish voting eligibility commits election fraud. 52 U.S.C. §§ 10307(c), 20511(2).

158.     Fraud can occur where an individual causes the production of voter registrations that qualify alleged voters to vote for federal candidates, where that individual knows the registrations are materially defective under applicable state law. 52 U.S.C. § 20511(2)

159.     However, election fraud need not involve the participation of individual voters. Election fraud can occur where an individual or organization places fictious names on voter rolls (allowing for fraudulent ballots which can later be used to stuff the ballot box, *supra*.), casting fake ballots in the names of people who did not vote, obtaining and marking absentee ballots without the input of the voter involved, and falsifying vote tallies.

160.     When the federal government seeks to maintain the integrity of elections, it does so for specific federal interests *inter alia*: (1) the protection of the voting rights of racial, ethnic, or language minorities, a specific constitutional right; (2) the registration of voters to vote in federal elections; (3) the standardization and procurement of voting equipment purchased with

federal funds; (4) the protection of the federal election process against corruption; (5) the protection of the voting process from corruption accomplished under color of law; and (6) the oversight of non-citizen and other voting by persons ineligible to vote under applicable state law. Richard C. Pilger, *Federal Prosecution of Election Offenses*, p. 30, 8th Edition (2017).

161.    Congress has enacted a litany of specific crimes that can be prosecuted under a general definition as "election fraud":

    a.  Conspiracy Against Rights: 18 U.S.C. § 241. *See United States v. Saylor*, 322 U.S. 385 (1944) (stuffing a ballot box with forged ballots); *United States v. Classic*, 313 U.S. 299 (1941) (preventing the official count of ballots in primary elections); *United States v. Townsley*, 843 F.2d 1070, 1073–75 (8th Cir. 1988) (destroying ballots); *United States v. Morado*, 454 F.2d 167, 171 (5th Cir. 1972) (casting absentee ballots in elderly or handicapped peoples' names); *Crolich v. United States*, 196 F.2d 879, 879 (5th Cir. 1952) (impersonating qualified voters); *United States v. Colvin*, 353 F.3d 569, 576 (7th Cir. 2003) (conspiracy need not be successful nor need there be an overt act).

    b.  Deprivation of Rights under Color of Law: 18 U.S.C. § 242. *See United States v. Price*, 383 U.S. 787 (1966) (acted jointly with state agents); *Williams v. United States*, 341 U.S. 97 (1951) (actions clothed under Color of State Law).

    c.  False Information in, and Payments for, Registering and Voting: 52 U.S.C. § 10307(c).[6]

    d.  Voting More than Once: 52 U.S.C. § 10307(e).

---

[6]    "Section 10307(c) protects two distinct aspects of a federal election: the actual results of the election, and the integrity of the process of electing federal officials." *United States v. Cole*, 41 F.3d 303, 307 (7th Cir. 1994).

e.   Fraudulent Registration or Voting: 52 U.S.C. § 20511(2).

f.   False claims to Register or Vote: 18 U.S.C. § 1015(f).

g.   "Cost-of-Election" theory: 18 U.S.C. § 1341.

h.   Improper Retention of Federal Election Returns: 52 U.S.C. § 20701.

162.   In short, election fraud can constitute numerous different actions or inactions, and federal and state governments of the United States have an interest in guarding the integrity of elections, and ensuring election fraud is stopped, then prosecuted appropriately.

## Facts and Summary of the Issues

163.   Petitioner United Sovereign Americans received Pennsylvania's voter registration data from the 2022 general election – the data contained millions of entries of voter registration data.

164.   Thereafter, expert data analysts acting on behalf of Petitioner United Sovereign Americans performed a series of SQL database queries on the data to extrapolate and refine information about voter registrations in the Commonwealth. *See* Exhibit "A" for a copy of the SQL Database Queries.

165.   Thereafter, Petitioner United Sovereign Americans thoroughly reviewed the results.

166.   United Sovereign Americans' SQL database queries revealed hundreds of thousands of voter registration apparent errors in the Commonwealth of Pennsylvania. See *Infra.*

167.   The results from the SQL database queries allowed Petitioners' experts to produce a "Scorecard" reflecting Pennsylvania's voter registration data detailing the hundreds of thousands of apparent errors contained within that registration data. *See* Exhibit "B" for a copy of United Sovereign American's Pennsylvania 2022 General Election Validity Scorecard.

168.     In addition, the results from the SQL Database Queries of Pennsylvania's voter registration data allowed Petitioners' experts to compile a General Election Validity Reconciliation. *See* Exhibit "C" for a copy of United Sovereign American's Pennsylvania 2022 General Election Validity Reconciliation.

169.     The results from the SQL Database Queries of Pennsylvania's voter registration data also revealed that apparent errors were not uniform across Pennsylvania – some counties had far more registration apparent errors than others. *See* Exhibit "D" for a copy of United Sovereign American's Pennsylvania 2022 General Election county-by-county breakdown.

170.     According to the data provided to Petitioner United Sovereign America for the 2022 election, Pennsylvania had 8,755,458 voter registrations.

## A.  VOTER REGISTRATION ROLL INACCURACY

171.     Expert analysis by Petitioner United Sovereign Americans of the official Pennsylvania State Voter Registration Data for the 2022 election revealed that, out of 8,755,458 voter registrations, there was a total of **3,192,069** voter registration violations including:

20,097 Illegal duplicates, where the same voter has multiple registrations

43,083 Illegal or invalid vote history[7]

10,298 Questionable designations of "Inactive Status"

194 Votes while inactive

28,256 Backdated registrations

268,493 Registrations where the period of active registration conflicts with the registration participation

448,335 Invalid or illogical registration dates[8]

---

[7]     Voter history exists prior to the voter's birth or prior to the voter attaining the age of eighteen (18) years.
[8]     Registrations on a federal holiday, before eligibility, etc.

633,508 Illegal or invalid registration changes

4,142 Age discrepant registrants[9]

154,913 Registrants with questionable address

1,580,750 Registrations with Records Altered After Certification

*See* Exhibit "B" for a copy of United Sovereign American's Pennsylvania 2022 General

Election Validity Scorecard.

172.    This data shows that in 2022 the voter rolls in Pennsylvania were not accurate and

current as required by NVRA, HAVA, nor in conformity with specific Pennsylvania laws

pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081; and 25 PA.

C.S. § 1222.

173.    Thus far, Petitioners have exhausted every remedy known to them in advance of

the 2024 general election to have these issues corrected. Petitioners continued in 2024 to seek

redress and repair for these egregious violations through democratic means.

174.    Respondents have dismissed, and continue to dismiss, Petitioners' concerns and,

based on information and belief, did so without any meaningful review, action, or response.

175.    Petitioners believe and therefore aver Respondents intend to administer and

ultimately certify Pennsylvania's 2024 general election (involving both state and federal

contests) using the same inaccurate and flawed data and conditions.

**B.  VOTES FROM INELIGIBLE VOTERS**

176.    Expert analysis on behalf of Petitioner United Sovereign Americans of the official

Pennsylvania State Voter Registration Data for the 2022 election revealed that, out of the votes

---

[9] Registrants before the age of eighteen (18) or older than the age of one hundred fifteen (115).

cast in the 2022 general election, there were a total of **1,198,598** evident voting violations, and **1,089,750** *unique* votes impacted by apparent voting violations.[10] These violations were in the form of:

8,026 Illegal Duplicates, where the same voter has multiple registrations.

15,674 Vote History Invalid or Illogical[11]

1,996 Questionable moving the voter to Inactive Status

118 Voted While Inactive

196 Registrations where the period of active registration conflicts with the registration participation

340,266 Invalid or Illogical Registration Dates

632,215 Illegal or Invalid Registration Changes

2,207 Age Discrepant Registrants[12]

59,609 Registrants With Questionable Addresses

138,291 Registrants With Altered Votes after Certification

*See* Exhibit "B" for a copy of Petitioner United Sovereign American's Pennsylvania 2022 General Election Validity Scorecard.

177.    Petitioners believe and therefore aver this data shows that in 2022 the voter rolls in Pennsylvania are not accurate and current as required by the NVRA, HAVA, and specific Pennsylvania laws pertaining to voter registration. 52 U.S.C.A. § 20501(b)(4); 52 US.C.A. § 21081; and 25 PA. C.S. § 1222.

---

[10] Some registered voters have more than one violation. The number of unique voters indicates how many individual registrations have apparent errors – whether it be one or multiple apparent errors.
[11] Voter history exists prior to the voter's birth or prior to the voter attaining the age of eighteen (18) years.
[12] Registrants younger than the age of eighteen (18) or older than the age of one hundred fifteen (115).

178.     Thus far, Petitioners have exhausted every remedy known to them in advance of the 2024 general election to have these issues, and all issues raised below, addressed and remedied. Petitioners continued in 2024 to seek redress and repair for these egregious violations through democratic means.

179.     Respondents have ignored or dismissed, and continue to ignore or dismiss, these concerns without apparent meaningful review, action, or response, and furthermore Petitioners believe and therefore aver Respondents intend to administer and certify Pennsylvania's 2024 general election (involving both state and federal contests) under the same inaccurate and flawed conditions as that have utilized previously in conducting Pennsylvania's combined federal and state elections.

### C.  ERROR RATES IN 2022 COMPARED TO RATES PERMITTED BY FEDERAL LAW

180.     Pennsylvania's voting systems are subject to the permissible error rates set forth by Congress in HAVA and further elucidated in FEC Voting System Standards 3.2.1 and explained in the VVSG. *Supra*.

181.     The *maximum* number of apparent voting system errors permissible in counting votes in the 2022 Pennsylvania General Election using the calculations set forth by the Federal Election Commission upon mandate by Congress was forty-four (44) errors at most allowed. The total number of Unique Ballots impacted by voting system errors in the Pennsylvania General Election, however, was 1,089,706 apparent errors. *See* Exhibit "B."

182.     Even accounting for the possibility that of the 1,089,706 apparent errors, many were not true errors, Petitioners believe and therefore aver, the Commonwealth cannot reduce that number to forty-four (44) or less.

183.    Under HAVA, an error rate of no more than one in 125,000 is permissible before the results of the *entire election* becomes suspect, and the integrity and reliability of the election compromised.   As mentioned above, this figure is calculated by dividing the total number of Pennsylvania votes in a given election by 125,000, to arrive at the number of permissible errors in any given election in order to create the error rate of no more than one in 125,000 mandated by the VVSG.

184.    For the 2022 General Election this is 5,410,022 (votes cast) divided by 125,000 leaves forty-four 44 (rounded up) as the maximum errors permitted, meaning that in order for the election to be considered valid, there cannot have been more than 44 voting system apparent errors in the entire ballot tabulation for all ballots cast in that election in Pennsylvania.

185.    However, in the 2022 Pennsylvania General Election, the number of voting system apparent errors in counting ballots for the 2022 general election was 1,089,750, a figure dramatically exceeding the maximum allowable apparent error rate of forty-four (44).

186.    Because the voting system apparent error rate for the 2022 Pennsylvania General Election was far above the maximum allowable error rates, Petitioners believe and therefore aver the reliability and credibility of the 2022 results are cast into doubt as a matter of law.

**VOTER-TO-VOTE DEFICIT**

187.    The official canvas for the 2022 Pennsylvania Election was 5,410,022 ballots cast yet the data shows there exist 5,400,869 total votes cast – a discrepancy of 9,153 votes. *See* Exhibit "B."

188.    This discrepancy can best be defined as a Voter-to-Vote deficit.

189.    Additionally, the official canvas for the 2022 Pennsylvania Election was

5,410,022 votes (ballots counted) yet there exist only 5,400,869 *voters who actually voted* according to the data provided – a discrepancy of 9,153 votes that are completely unaccounted for and cannot be explained—a number far in excess of forty-four (44) and indisputably each constitution an "error."

190.    Petitioners believe and therefore aver that the **9,153 more votes counted than voters who voted** means that either tabulators overcounted votes statewide, or there is an alternative source of the data discrepancy.[13]

### D.  PENNSYLVANIA'S 2022 GENERAL ELECTION VALIDITY

191.    For Pennsylvania's 2022 General Election, out of the 8,755,458 total registrations, of which Petitioners believe and therefore aver, there were 4,739,544 *valid* registrations, 1,370,573 uncertain/illogical/invalid registrations, 1,440,667 registrations which violated election laws, and 1,204,674 "Deadwood" registrations.[14] *See* Exhibit "C."

192.    Petitioner believes and therefore avers that of the people holding the 4,739,544 valid registrations, 4,311,119 votes were counted in the 2022 General Election.

193.    Petitioner believes and therefore avers that of the identified 1,370,573 uncertain/illogical/invalid registrations, 132,897 people voted and had their votes counted in the 2022 General Election.

---

[13]      Petitioners accuse no one of engaging in fraud or deceit.  Petitioners merely point out the discrepancy, which could be due to unintentional tabulator error, some fraud of unknown origin, a combination of both, or even fraud by the tabulators themselves. The discrepancy occurred in 2022 for an unknown reason.  It is the deficit *itself*, regardless of the cause, that demonstrates an error rate in excess of that permitted by HAVA calling into question the integrity of the election.  Petitioners propose to ask this Court to order Respondents to ascertain why the deficit occurred in 2022, ensure that a similar deficit does not re-occur in 2024, and in all federal elections thereafter in the future.

[14]      "Deadwood" is a concept dealing with election fraud and is defined as a fake voter registration record. These registrations could include a voter who is deceased, ineligible, moved, etc.

194.    Petitioner believes and therefore avers that of the 1,440,674 registrations that violated election laws, **956,853** people holding such registrations *cast votes that were counted* in the 2022 General Election.

195.    Petitioner believes and therefore avers that while none of the 1,204,674 "Deadwood" registrations, or fake name registrations, are listed as having voted in the 2022 General Election, those registrations exist and thus *could* be utilized fraudulently in future elections.

196.    Petitioner believes and therefore avers that the *registration* error rate in Pennsylvania for the 2022 General Election was **thirty-two percent (32%)** of the total registrations on the Commonwealth's voter rolls.  This figure is arrived at by taking 1,370,573 uncertain/illogical/invalid registrations, plus 1,440,667 registrations which violated election laws, as a percentage of 8,755,458 total registrations.

197.    Petitioner believes and therefore avers that the *vote*r system error rate in Pennsylvania for the 2022 General Election was **twenty percent (20%)**, arrived at by taking 132,897 votes counted from uncertain/illogical/invalid registrations, plus 956,853 votes counted from illegal registrations, as a percentage of 5,400,869 votes cast.

198.    For example, the margin of victory in PA Congressional District 7 in 2022 was two percent (2%), or 151,364 votes to the winner and 145,527 votes to the loser. The apparent error rate statewide in the 2022 federal election when applied to the Congressional Election in PA District 7 exceeds the margin of victory for this particular congressional district, meaning that if the apparent error rate in the Commonwealth is evenly distributed by Congressional District (which *ordinarily might* be a reasonable assumption given that such districts must contain roughly the same number of people under the Constitution), the Congressional Election results in

District 7 election would be considered unreliable.[15]  That is not to say that the eventual

"winner" there did not receive more votes than the eventual "loser."  It simply means if the

apparent error rate is assumed to be evenly distributed throughout Pennsylvania, the winner in

the 7th cannot be *confident* in his/her election, and the loser cannot be *confident* in his/her defeat

*because the election itself* would not have produced results according to law that are reliable,

meaning the integrity of the entire election process is called into question.

199.    To expand on the above, Pennsylvania's 2022 voter system error rate of 20%

*exceeded* the margin of victory in six of the Commonwealth's 17 Congressional Districts: 1, 6, 7,

8, 12, and 17.  Thus, 35% of Pennsylvania's *current* members of the United States House of

Representatives *might* hold their seats owing to legally unreliable election results.

200.    Per HAVA and the FEC, the legal standard of allowable registration errors for a

federal election is 0.0008% (or 1 out of 125,000) yet the voter system error rate in

Pennsylvania's 2022 combined state and Federal General Election was 20%.

### Requested Relief

### ALL WRITS ACT RELIEF – 28 U.S.C. § 1651

201.    Petitioners incorporate the previous paragraphs by reference as if set forth at

length here.

202.    Petitioners are not seeking to undermine official elections results previously

certified.  Petitioners have cited issues in prior Pennsylvania federal elections to add weight to

Petitioners' belief that absent intervention by this Honorable Court, Respondents will permit the

---

[15]      This is merely a simplified example for illustrative purposes as Petitioners are aware that the apparent error rates are not evenly distributed county-by-county and thus cannot be evenly distributed by congressional district. For a county-by-county breakdown from highest to lowest apparent error rate by total numbers please see Exhibit "D" demonstrating which Pennsylvania counties account for the greatest number of errors by total number.

same apparent errors to occur in the 2024 General Election in Pennsylvania, and in all following federal elections in the Commonwealth.

203.    Petitioners seek redress from the constitutional harm brought upon them, and the Pennsylvania electorate at large, by Respondents failure to comply with federal and state election law.

204.    Petitioners believe and therefore aver that Respondents have done nothing or an inadequate job at addressing the issues presented in this Petition – particularly to address the inaccurate and likely fraudulent voter rolls and voter systems used in federal elections conducted by state authorities.

205.    Respondents' inaction and/or failure to act compels Petitioners to ask that the Court to issue a Writ of *Mandamus* requiring Respondents to comply with the two federal statutes at issue (the NVRA and the HAVA) along with the Pennsylvania Election Code, 25 PA. C.S. § 1222(c), while giving Respondents a reasonable time within which to bring Pennsylvania into compliance in time for the 2024 General Election and all federal elections conducted by the Commonwealth going forward while providing relief to 2024 voters if bringing the Commonwealth into compliance in time is impossible upon showing by Respondents.

206.    Specifically, Petitioners respectfully seek that the Court order Respondents take steps, both short term and long term, to ensure the apparent errors made during the 2022 elections do not recur and to bring the Commonwealth into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes.

207.    This Honorable Court is authorized to issue a writ of *mandamus* under "The All-Writs Act," 28 U.S.C. § 1651 granting the power to United States Federal Courts to "issue all

writs necessary or appropriate in the aid of their respective jurisdictions and agreeable to the usages and principles of law."

208.    A writ of *mandamus* under 28 USC § 1651 is typically used to fill gaps in the law, and the Supreme Court has stated that The All-Writs Act is a "legislatively approved source of procedural instruments designed to achieve 'the rational ends of the law.'" *Harris v. Nelson*, 394 U.S. 286 (1969) (All Writs Act *mandamus* properly used to conduct factual inquiries).

209.    A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (*quoting Cheney v. United States Dist. Ct.*, 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law)).

210.    A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the petitioner has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

211.    A federal court may use all auxiliary writs as aids when it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it." *Adams v. United States*, 317 U.S. 269, 273 (1942) (writ of *habeas corpus* is available to the circuit courts of appeals).

212.    A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

213.    "Mandamus is employed to compel the performance, when refused, of a ministerial duty . . . [i]t also is employed to compel action, when refused, in matters involving

judgment and discretion, but not to direct the exercise of judgment or discretion in a particular

way nor to direct the retraction or reversal of action already taken in the exercise of either."

*Wilbur v. United States*, 281 U.S. 206, 218 (1930). *See also Decatur v. Paulding*, 39 U.S. 497,

514-17 (1840) (Secretary of the Navy's duty to approve of pensions was discretionary, and

therefore, not ministerial); *Kendall v. United States*, 37 U.S. 524 (1838) (Postmaster General had

a ministerial duty to make entries);  *Work v. Rives*, 267 U.S. 175, 177 (1925).

214.    Instantly, Petitioners have no other remedy than a writ of *mandamus*.

215.    Petitioners argue that injunctive and/or declaratory relief is inapplicable or

inappropriate in this issue because the harm from the 2024 election is not yet realized and

Petitioners are seeking to have Pennsylvania election officials and/or federal officials bring the

Commonwealth into compliance with federal and state law, specifically HAVA, NVRA, and the

Pennsylvania Election Code, 25 PA. C.S. § 1222(c), absent a specific existing private cause of

action Petitioners could assert that affords Petitioners relief.

216.    Petitioners believe and therefore aver Respondents have allowed, and continue to

allow, violations of federal election laws, Commonwealth election laws, the United States

Constitution, and federal civil rights laws pertaining to voter rights, which include mandating

accurate registration rolls, transparency, compliance, and proper certification of the voting

systems. 52 US.C.A. § 20501; 52 US.C.A. § 21083.

217.    Petitioners believe and therefore aver that the voter rolls within the

Commonwealth of Pennsylvania are inaccurate, in violation of NVRA and HAVA. These are not

list maintenance failures. The inaccuracies represent a failure to control the process of validating

and registering only qualified citizen voters. These apparently invalid and/or illegal registrations

voted in large numbers in Pennsylvania's 2022 General Election.

218.    Petitioners believe and therefore aver the Respondents have lost control of voter registration, leading to the distribution of ballots to what appear to be false registrants which results in a diluted vote and further harm to petitioners and the electorate at large. The voter-to-vote deficit is illustrative here in that the official canvas for the 2022 Pennsylvania Election was 5,410,022 votes yet there exist 5,400,869 total votes in the data – a discrepancy of 9,153 votes. Upholding HAVA includes the risk assessments and proper certification of all system elements individually, and as a system as a whole.

219.    Petitioners believe and therefore aver an election official's job is fidelity to the law in administering the electoral process, thereby protecting the integrity of an election, and the citizens from corruption in the election process.

220.    Petitioners believe and therefore aver that Commonwealth officials' failure to follow the law has resulted in election outcomes that are untrustworthy. The voting system in its present form cannot be used to produce trustworthy reliable results without the requested judicial intervention.

221.    Petitioners believe and therefore aver a writ of *mandamus* is appropriate in this case. Respondents have failed, and continue to fail, in complying with federal and state laws regarding voting – including voting accuracy and accountability. It is clear from the Respondents conduct before, during, and after, the 2022 elections that, absent judicial action, Respondents will do nothing to repair the deficiencies noted above to ensure the integrity of Pennsylvania elections are conducted in compliance with federal and state law.

222.    The scope of Petitioners' *mandamus* request is narrow: Petitioners seek this Court to order Respondents follow existing federal and state law designed by Congress and the Pennsylvania General Assembly to ensure that Pennsylvania's 2024 and subsequent combined

federal and state general elections produce reliable results within the margin of error rate allowed.

223.     Petitioners hold up the mathematically unreliable (according to, *inter alia*, HAVA) 2022 Pennsylvania combined federal and state General Election as evidence that, should the writ not issue, the apparent error rate in the 2024 and subsequent combined general elections will continue to exceed the law's mandated maximum error rate permitted before an election is unreliable.

224.     Petitioners' seek that the requested writ direct Respondents to investigate and remedy the issues exposed in the 2022 elections to avoid repeating the same mistakes in future combined federal and state general elections which are constitutionally administered by Pennsylvania pursuant to Article I, Section 4 (delegating to the state legislatures the power to regulate federal elections for members of the House of Representatives, with Congress reserving the power to "…alter such Regulations [made by the various state legislatures]…"),[16] and, generally, Article II, Section 1 (granting state legislatures the power to determine how presidential electors are chosen) of the United States Constitution.[17]

225.     Petitioners believe and therefore aver that since the Constitution reserves to Congress the *ultimate* (as opposed to the *presumptive*) power to regulate the means by which

---

[16]     Petitioners aver that NVRA and HAVA are examples of Congress' exercising its power under Article I, Section 4 to "alter" Pennsylvania's (and all other state's) otherwise absolute constitutional authority to regulate federal elections to the House of Representatives and, by application of the 17th Amendment to the U.S. Constitution providing for the direct election of two senators from each state, Congress may exercise its authority "…from time to time by Law make or alter such Regulations…" [of the various states…] to regulate the election of United States Senators as well the election of members of the House of Representatives.

[17]     Petitioners include citation to Article II and the choosing of electors for president and vice-president, (later modified by the 12th Amendment), to again demonstrate the Framers' intent that the various states shall have presumptive authority to regulate and administer the election of all federal officers on the ballot for consideration in a federal election.  Article 1, Section 4 (as later amended) and Article II, Section (as later amended) are examples of where the Framers intentionally intertwined the powers of the various states with those of Congress, while making certain Congress maintained the *ultimate* power to regulate the election of its members, the then-prevailing concepts of *Federalism* and *Dual Sovereignty* notwithstanding.

Congress' own members are chosen, while the Constitution simultaneously delegates the presumptive power to regulate such elections to, in this case, the General Assembly of the Commonwealth of Pennsylvania to further delegate as it sees fit to do so by law, the Respondents who are not federal officers *per se*, become federal officers by agency requiring them to carry out not only Pennsylvania election law, but additionally to carry out federal election statutes passed by Congress and duly signed into law by the President under Congress' ultimate authority laid out in Article I, Section 4.

226.    Petitioners believe and therefore aver that delegations of authority by the General Assembly of powers to supervise federal elections to any Respondent Commonwealth officials pursuant to the General Assembly's power to regulate federal elections granted by Article I, Section 4, makes said Commonwealth Respondents into federal officers by agency or quasi-federal officials in the carrying out of their duties to regulate federal elections.

227.    Petitioners believe and therefore aver that ordinary principles of federalism and dual sovereignty where a Federal District Court Judge would be reluctant to issue an order to a Commonwealth official pertaining to how that state official may perform his/her official functions are inapplicable because the Respondent Commonwealth official is acting in his/her hybrid role as a quasi-federal officer as required by Article I, Section 4.

228.    Petitioners believe and therefore aver, then, that this Honorable Court has authority to issue the requested writ of *mandamus* to compel, not just the Respondent Federal officers to ensure that federal election law is carried out in Pennsylvania's 2024 and subsequent general elections, this Court also has the authority to compel Respondent Commonwealth officials because said officials are charged by the U.S. Constitution in the carrying out of federal

law where Congress has asserted its power to "alter" existing Pennsylvania federal election procedures as it did in enacting NVRA and HAVA.

229.    Petitioners believe and therefore aver that any delegation from the Pennsylvania General Assembly to the Executive Branch of Pennsylvania government (e.g., to the Governor who in turn delegates power to the Secretary of State, or any delegation of the General Assembly's power to regulate federal elections to the Attorney General) still falls under this Court's authority which is derived through Article I, Section 4's grant to the various state legislatures of the power to supervise federal elections.

230.    Petitioners believe and therefore aver that simply because the General Assembly may have chosen to delegate some of its authority to supervise federal elections to Respondent members of the Commonwealth's Executive Branch of government, such delegation does not insulate such officials from the power of this Court, since this Court's power comes from its authority over the delegating entity, in this case the Pennsylvania General Assembly.

## ACTION TO COMPEL AN OFFICER OF THE UNITED STATES TO PERFORM HIS DUTY – 28 U.S.C. § 1361

231.    Petitioners incorporate the previous paragraphs as if set forth at length here.

232.    District Courts are empowered with the ability to compel an officer or employee of the United States or any agency thereof to perform a duty owed to a plaintiff. 28 U.S.C. § 1361.

233.    Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are parties responsible for the enforcement of federal election laws, specifically HAVA and NVRA.

234.     Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice are officers, employees, or an agency of the United States.

235.     Petitioners believe and therefore aver that Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice, have done nothing, or, at best, an inadequate job at addressing the issues presented above – namely, the inaccurate and likely fraudulent voter rolls and systems within Pennsylvania.

236.     The inaction and/or failure to act is harming Petitioners and the Pennsylvania electorate at large warranting that the Court issue a Writ of *Mandamus* compelling Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice to enforce and police the two federal statutes at issue (NVRA and HAVA) for implementation in the Pennsylvania 2024 General Election and subsequent combined federal and state elections administered by Commonwealth officials and giving Respondents a reasonable period of time in which to do so.

237.     Specifically, the Court should order Respondents to take preventative measures to see the apparent errors evident the 2022 elections are not repeated in the 2024 and subsequent elections and bring the Commonwealth into compliance with HAVA's specific mandate of no greater than 1 voting error out of 125,000 votes to ensure reliable election results as HAVA intended.

238.     A writ of *mandamus* is warranted where "(1) no other adequate means exist to attain the relief, (2) the party's right to issuance of the writ is clear and indisputable, and (3) the writ is appropriate under the circumstances." *Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010)

(quoting *Cheney v. United States* Dist. Ct., 542 U.S. 367, 380–81 (2004) (stay granted where district court likely did not follow federal law).

239.     A writ of *mandamus* is appropriate and necessary to vindicate the rights of citizens when a governmental agency or official has refused to perform a ministerial duty that the petitioner has established has a clear legal right to have the governmental agency or official, in this case Respondents, perform.

240.     A "ministerial action" is a duty in a particular situation so plainly prescribed as to be free from doubt and equivalent to a positive command. *Wilbur v. United States*, 281 U.S. 206, 218 (1930); *see also Will v. United States*, 389 U.S. 90 (1967).

241.     Relief contemplated under statute providing that federal district courts shall have original jurisdiction of any action in nature of mandamus to compel an officer or employee of United States or any agency thereof to perform a duty owed to plaintiff is at least as broad as under common-law writ of mandamus. *Carey v. Local Bd. No. 2, Hartford, Conn.*, 297 F.Supp. 252 (D. Conn. 1969), aff'd, 412 F.2d 71 (2d Cir. 1969).

242.     Petitioners believe and therefore aver they have no other remedy than a writ of *mandamus* and to compel an officer or employee of the United States or any agency thereof to perform a duty owed to plaintiff/petitioner.

243.     Petitioners argue that an injunctive and/or declaratory relief is inapplicable or inappropriate in this issue because the harm from the 2024 election is not yet realized and Petitioners are seeking to have Pennsylvania election officials and/or federal officials bring the Commonwealth into compliance with federal and state law, specifically HAVA, NVRA, and the Election Code, absent a specific private cause of action that affords Petitioners relief.

244.    Petitioners believe and therefore aver Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have allowed, and continue to allow, violations of federal election laws, the United States Constitution, and federal civil rights laws pertaining to voter rights, which include mandating accurate registration rolls, transparency, compliance, and proper certification of the voting systems.

245.    Petitioners believe and therefore aver the voter rolls within the Commonwealth of Pennsylvania are inaccurate, in violation of NVRA and HAVA. That these are not list maintenance failures. Instead, the inaccuracies represent a failure to control the process of validating and registering only qualified citizen voters. Persons voted in the Pennsylvania 2022 General Election in significant numbers who held apparently invalid and/or illegal registrations.

246.    Petitioners believe and therefore aver that Respondents' failure to follow the law, or enforce the law, has resulted in election outcomes that are untrustworthy and unreliable. The Commonwealth's voting system in its present form cannot be trusted to produce reliable results under HAVA, because Respondents will not follow the dictates of the Act necessitating judicial intervention.

247.    A writ of *mandamus* against Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice is appropriate in this case. Respondents Merrick Garland, in his Official Capacity as Attorney General of the United States, and the United States Department of Justice have failed, and continue to fail, in forcing the Commonwealth of Pennsylvania to comply with federal laws regarding voting – including voting accuracy and accountability as is clear from how the 2022 Pennsylvania General Election was conducted.

248.     Petitioners believe and therefore aver that without judicial action, Respondents will do nothing to comply with HAVA and other federal and state statutes to ensure the integrity of Pennsylvania's elections and the same issues evident from the 2022 General Election will call into question the validity of Pennsylvania's 2024 General Election results.

249.     The scope of this request for a writ of *mandamus* is narrow: Petitioners seek a judicial order requiring Respondents both federal and state to follow the laws cited herein in conducting the 2024 and subsequent federal elections, and adequately investigate and remedy the problems exposed in and 2022 elections and detailed above.

## CONCLUSION

Pennsylvania's voter registration rolls contained hundreds of thousands of apparent errors in the 2022 general election. These apparent errors took the form of illegal duplicate registrations, voters with invalid or illogical voter history, voters assigned to questionable inactive statuses, backdated registrations, registrations with a modified date prior to registration, invalid or illogical registration dates, age discrepant registrants, and registrants with questionable addresses. This Honorable Court should enter an order in mandamus compelling Respondents to ministerially correct the apparent errors evident from the 2022 elections data and prevent those same or similar ministerial errors from recurring during the Pennsylvania 2024 General Election and all subsequent federal general elections to insure the integrity of Pennsylvania's combined federal and state elections going forward for years to come.

Respectfully Submitted,

**Van der Veen, Hartshorn, Levin, & Lindheim**

Date: June 18, 2024                    By:    */s/ Bruce L. Castor, Jr.*
                                       Bruce L. Castor, Jr.
                                       PA I.D. No. 46370
                                       Michael T. van der Veen
                                       PA I.D. No. 75616
                                       Attorneys for Petitioners
                                       1219 Spruce Street
                                       Philadelphia, PA 19107
                                       Main: (215) 546-1000
                                       Fax: (215) 546-8529
                                       Email: bcastor@mtvlaw.com
                                       Email: mtv@mtvlaw.com

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that I have reviewed the

foregoing Petition and that the factual allegations are true and correct.


_06/12/2024_
Date

_Dean W. Dreibelbis_
Dean Dreibelbis

## VERIFICATION

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that I have reviewed the foregoing Petition and that the factual allegations are true and correct.


_June 11, 2024_
Date

_Diane Houser_
Diane Houser

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that I have reviewed the

foregoing Petition and that the factual allegations are true and correct.


June 12, 2024
_____
Date

_____
Marly Hornik
*On Behalf of United Sovereign Americans*

**VERIFICATION**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that I have reviewed the

foregoing Petition and that the factual allegations are true and correct.

June 11, 2024

Date

Ruth Moton