Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

2020 WL 6880960

2020 WL 6880960
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

Bob BOLUS, Sr., Plaintiff,

v.

Kathy BOOCKVAR, et al., Defendants.

CIVIL ACTION NO. 3:20-CV-01882
|
Signed 10/27/2020

**Attorneys and Law Firms**

Bob Bolus, Throop, PA, pro se.

**REPORT AND RECOMMENDATION**

KAROLINE MEHALCHICK, United States Magistrate
Judge

 **\*1** Before the Court is a complaint containing a request
for a preliminary injunction filed by Plaintiff Bob Bolus, Sr.
("Bolus") on October 13, 2020. [1] (Doc. 1). The Defendants
in this matter are Kathy Boockvar as the Secretary of
the Commonwealth, as well as the Board of Elections
of every county in Pennsylvania. Bolus seeks a Court-
issued preliminary injunction prohibiting Defendants from
collecting absentee and mail-in ballots through "unsecured
and unmonitored drop boxes" as well as in locations other
than the County Election Board office. (Doc. 1, at 19-20).
Bolus also seeks to prohibit Defendants "from counting
absentee and mail-in ballots that lack an 'Official Election
Ballot' secrecy envelope or contain on that envelope any
text, mark, or symbol which reveals the elector's identity,
political affiliation, or candidate preference." (Doc. 1, at 20).
Finally, Bolus seeks to enjoin Defendants from restricting
poll watchers to their county of residence and to allow them
to be present wherever absentee or mail-in ballots are being
returned, either before or on Election Day including at pre-
canvass meetings. (Doc. 1, at 20).

**I. PRELIMINARY INJUNCTION STANDARD**
Four factors govern a district court's decision in considering
a preliminary injunction: (1) whether the movant has shown
a reasonable probability of success on the merits; (2) whether
the movant will be irreparably injured by denial of the

relief, (3) whether granting preliminary relief will result in
even greater harm to the nonmoving party; and (4) whether
granting the preliminary relief will be in the public interest.
*Grill v. Aversa*, 908 F. Supp. 2d 573, 591 (M.D. Pa. 2012);
*Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994); *SI
Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d
Cir. 1985); *see also Highmark, Inc. v. UPMC Health Plan,
Inc.*, 276 F.3d 160, 170–71 (3d Cir. 2001).

A preliminary injunction is an extraordinary and drastic
remedy, one that should not be granted unless the movant,
by a clear showing, carries the burden of persuasion. Such
relief is extraordinary in nature and should issue in only
limited circumstances. *See Am. Tel. & Tel. Co. v. Winback
& Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir.
1994). In order to satisfy this exacting standard, the party
moving for a preliminary injunction must carry its burden of
demonstrating both: (1) likelihood of success on the merits;
and (2) the existence of irreparable injury from the alleged
misconduct. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*,
882 F.2d 797 (3d Cir. 1989). If the movant fails to carry this
burden on these two elements, the motion should be denied
since a party seeking such relief must "demonstrate both a
likelihood of success on the merits and the probability of
irreparable harm if relief is not granted." *Hohe v. Casey*, 868
F.2d 69, 72 (3d Cir. 1989) (emphasis in original) (*quoting
Morton v. Beyer*, 822 F.2d 364 (3d Cir. 1987)). Further, given
the extraordinary nature of this form of relief, a motion for
preliminary injunction places precise burdens on the moving
party.

 **\*2** As a threshold matter, it is a movant's burden to show
that the "preliminary injunction must be the only way of
protecting the plaintiff from harm." *Campbell Soup Co. v.
ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in
original, citations omitted). Therefore, "upon an application
for a preliminary injunction to doubt is to deny." *Madison
Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir.
1937). A preliminary injunction "may not be used simply to
eliminate a possibility of a remote future injury." *Holiday
Inns of Am., Inc. v. B&B Corp.*, 409 F.2d 614, 618 (3d Cir.
1969). "[T]he irreparable harm must be actual and imminent,
not merely speculative." *Angstadt ex rel. Angstadt v. Midd-
West Sch.*, 182 F. Supp. 2d 435, 437 (M.D. Pa. 2002). "[M]ore
than a risk of irreparable harm must be demonstrated. The
requisite for injunctive relief has been characterized as a 'clear
showing of immediate irreparable injury,' or a 'presently
existing actual threat....'" *Continental Grp., Inc. v. Amoco
Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (citations

**Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)**

2020 WL 6880960

omitted). "A preliminary injunction cannot be issued based on past harm. The purpose of a preliminary injunction is to prevent *future* irreparable harm." *Fisher v. Goord*, 981 F. Supp. 140, 168 (W.D.N.Y. 1997) (emphasis in original). Thus, the relevant inquiry is whether the party moving for injunctive relief is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued.

Moreover, "[t]he 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.' " *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (quoting *Glasco v. Hills*, 558 F.2d 179, 181 (3d Cir. 1977)). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989) (emphasis added). "The word irreparable connotes 'that which cannot be repaired, retrieved, put down again, atoned for ...'." *Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) (citations omitted). If the record does not support a finding of both irreparable injury and a likelihood of success on the merits, then a preliminary injunction cannot be granted. *Marxe v. Jackson*, 833 F.2d 1121 (3d Cir. 1987).

## II. DISCUSSION

As observed previously, a preliminary injunction is an extraordinary remedy, one that should be ordered only in limited cases, upon a compelling showing. That showing has not been made in this case. Bolus's request fails the first requirement for a preliminary injunction: a likelihood of success on the merits. To meet this requirement, the movant must show a "reasonable probability" of success. *Punnett v. Carter*, 621 F.2d 578, 583 (3d Cir. 1980) (internal quotation marks omitted); *see Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc). Bolus does not establish a reasonable probability of success because he fails to establish standing.

### A. BOLUS LACKS STANDING.

"Article III of the Constitution limits federal-court jurisdiction to 'Cases' and 'Controversies.' " *Massachussetts v. EPA*, 549 U.S. 497, 515, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). To satisfy these constitutional standing requirements, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC) Inc.*, 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

Bolus's request for a preliminary injunction prohibiting Defendants from counting absentee and mail-in ballots which lack a so-called "secrecy envelope" or where the secrecy envelope contains "any text, mark, or symbol which reveals the elector's identity, political affiliation, or candidate preference" can be disposed of summarily. (Doc. 1, at 20). The Supreme Court of Pennsylvania already ordered that "a mail-in ballot that is not enclosed in the statutorily-mandated secrecy envelope must be disqualified," and that the secrecy envelope must be left "unblemished by identifying information" including who the elector is, with what party they are affiliated, or for whom they voted. *Pennsylvania Democratic Party v. Boockvar*, —— Pa. ——, 238 A.3d 345, 2020 WL 5554644, at *24, 26 (Sept. 17, 2020) (citing 25 P.S. §§ 3146.8(g)(4)(ii), 3150.16(a)). Since the Pennsylvania Supreme Court effectively ruled in Bolus's favor on this issue, it is no longer "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *See Friends of the Earth, Inc.*, 528 U.S. at 181, 120 S.Ct. 693 (holding redressability to be an element of standing under the Constitution). If this Court were to now issue a preliminary injunction on this issue, it would be redundant, and thus ineffective, in redressing any injury.

**\*3** Bolus additionally requests that (1) Defendants be enjoined from collecting absentee and mail-in ballots through "unsecured and unmonitored drop boxes" as well as in locations other than the County Election Board office, and (2) Defendants be enjoined "from restricting poll watchers, regardless of their county of residence, to be present in all locations where votes are cast, including without limitation where absentee or mail-in ballots are being returned before and on Election Day and at any pre-canvass meetings." (Doc. 1, at 19-20). In a recent case in the District of Nevada, a plaintiff took issue with similar election practices as Bolus does here. *See Paher v. Cegavske*, 457 F. Supp. 3d 919 (D. Nev. 2020). In *Paher*, the plaintiffs, who were all registered Nevada voters, sought to enjoin Nevada's Secretary of State from implementing a plan to mail all active registered voters an absentee ballot for the primary election. *Paher*, 457

Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

2020 WL 6880960

F. Supp. 3d at 922-23. Ballots were to be mailed to the voters' addresses on their voter registration forms. *Paher*, 457 F. Supp. 3d at 923. The plan also established physical polling places in each county so as to accommodate same-day registration requirements enacted by law. *Paher*, 457 F. Supp. 3d at 923. Plaintiffs challenged the expansion of mail-in voting, asserting that it "circumvents various statutory safeguards designed to protect against voter fraud, and that their votes will as a result be diluted by illegal votes." *Paher*, 457 F. Supp. 3d at 924. They additionally claimed that the plan violated their right to vote in a federal election where the manner of election is chosen by the state legislature. *Paher*, 457 F. Supp. 3d at 925.

The plaintiffs in *Paher* asserted that they had standing to bring suit because "mail-in ballots are unlawful under state law, resulting in vote dilution, and that vote dilution from voter fraud results in disenfranchisement, and 'disenfranchisement is a severe burden that is personal to the person disenfranchised.' " *Paher*, 457 F. Supp. 3d at 926. The court characterized their potential injury as follows: "the [p]lan will lead to an increase in illegal votes thereby harming them as rightful voters by diluting their vote." *Paher*, 457 F. Supp. 3d at 926.

Citing two United States Supreme Court cases as precedent, the court held that the plaintiffs lacked standing to bring this case because their "purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter." *Paher*, 457 F. Supp. 3d at 926. The Supreme Court has held that an injury must be "concrete and particularized." *Paher*, 457 F. Supp. 3d at 926 (citing *Spokeo Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) ("for an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.' ")). [2] Additionally, the Supreme Court has

> consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.

*Paher*, 457 F. Supp. 3d at 926 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573-74, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

The court concluded that claims of vote dilution have previously been found to lack injury-in-fact required for standing and that these plaintiffs, too, failed to allege a particularized injury so as to meet the first standing prong. *Paher*, 457 F. Supp. 3d at 926-27 (collecting cases).

As in *Paher*, Bolus alleges that without his requested preliminary injunction, his vote could be diluted due to voter fraud. (Doc. 1, at 8-9). Bolus states that the Fourteenth Amendment protects the "right of qualified citizens to vote in a state election involving federal candidates" and that "fraudulent votes 'debase' and 'dilute' the weight of each validly cast vote." (Doc. 1, at 8). Additionally, Bolus submits that the Fourteenth Amendment's Equal Protection Clause proscribes that every person's vote counts the same as all other voters in the State. (Doc. 1, at 9). Bolus further alleges that instituting "a patchwork of different rules from county to county" and a "voting system that involves discretion by decision makers about how or where voters will vote" violates the Equal Protection Clause. (Doc. 1, at 10). As for the limitations on poll-watchers, the only indication that this may affect Bolus is his statement that "without poll watchers, the integrity of the vote in elections is threatened and the constitutional right to free and fair public elections under the United States and Pennsylvania Constitutions is denied." (Doc. 1, at 16).

**\*4** First, these allegations fail to meet the first prong of the standing requirement because they are not particularized. *See Friends of the Earth, Inc.*, 528 U.S. at 180-81, 120 S.Ct. 693. *Paher* is directly on point: Bolus's alleged injury of having his vote diluted due to potential election fraud could conceivably be raised by any voter in the Commonwealth. *See Paher*, 457 F. Supp. 3d at 926. Bolus claims harm to every citizen's fundamental right to vote and that every voter's right to equal protection is at risk. (Doc. 1, at 8-10). Therefore, the relief he seeks would "directly and tangibly" no more benefit him than it would the public at large. (*See* Doc. 1, at 8-10). When this is the case, Article III case or controversy demands are not met. *See Lujan*, 504 U.S. at 573-74, 112 S.Ct. 2130. At no point in the Complaint does Bolus identify how he is more affected by vote dilution than any other voter in the Commonwealth. (Doc. 1). The lack of particularized injury weighs heavily against Bolus's reasonable probability of success on the merits. *See Grill*, 908 F. Supp. 2d at 591 (listing the preliminary injunction requirements).

Second, Bolus's allegations are speculative and hypothetical rather than likely, and actual or imminent. *See Friends*

Case 1:24-cv-01003-DFB    Document 28-1    Filed 10/29/24    Page 4 of 29

Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

2020 WL 6880960

*of the Earth, Inc.*, 528 U.S. at 180-81, 120 S.Ct. 693. Bolus states that "the use of 'standardless' procedures can violate the Equal Protection Clause," and that "allowing a patchwork of different rules from county to county in a statewide election involving federal and state candidates implicates equal protection concerns." (Doc. 1, at 10). But nowhere does Bolus identify the "patchwork of different rules," or "standardless procedures." (Doc. 1). He states that the Equal Protection Clause requires every county to apply the same election standards and procedures, but does not allege that counties are not applying uniform standards and procedures. (Doc. 1, at 18-19). In short, his complaint is composed of much law and little facts. (Doc. 1). Wholly lacking is any allegation that collecting ballots in locations other than the office of the County Election Board results in fraudulent ballots.[3] Bolus frequently expresses worry about events that could possibly happen, such as a car accident while transporting ballots or "ballots being mishandled and processed with other forms of alternate ballots." (Doc. 1, at 9, 16). He speaks often of procedural safeguards and risk of abuse. (Doc. 1, at 16-17). Speculative injury does not satisfy the 'case' or 'controversy' requirement to warrant consideration by this Court, however. *See Friends of the Earth, Inc.*, 528 U.S. at 180-81, 120 S.Ct. 693. Bolus must make a compelling showing that injury is both actual or imminent, and likely. *See Continental Grp., Inc.*, 614 F.2d at 359. There is no evidence – nor even, allegation – of actual, imminent, or likely injury. (Doc. 1). This failing also weighs heavily against Bolus's reasonable probability of success on the merits. *See Grill*, 908 F. Supp. 2d at 591 (listing the preliminary injunction requirements); *see also Donald J. Trump for President, Inc., v. Boockvar*, ——— F. Supp. 3d ———, 2020 WL 5997680, at *2 (W.D. Pa. 2020) (to issue an injunction, "[w]hile [p]laintiffs may not need to prove actual voter fraud, they must at least prove that such fraud is 'certainly impending.' ").

### B. BOLUS'S CLAIMS LACK MERIT.

Even if Bolus satisfied the standing requirements, his claims would fail on their merits. As alluded to *supra*, the Pennsylvania Supreme Court has addressed the constitutionality of poll watcher residency requirements, and has also deemed it within Pennsylvania law for mail-in ballots to be accepted at locations other than the office of the county board of elections. *Pennsylvania Democratic Party v. Boockvar*, 238 A.3d, 2020 WL. The right to serve as a poll watcher is conferred by statute rather than the Constitution, "is not incidental to the right of free association" so has no

distinct First Amendment protection, and does not implicate core political speech, so restrictions do not bear on an individual's constitutional right to vote. *Boockvar*, 238 A.3d, 2020 WL, at *30. Therefore, only a showing that a rational basis exists for restrictions on poll watchers is required. *Boockvar*, 238 A.3d, 2020 WL, at *30. That "clear rational basis" is that "Pennsylvania has envisioned a county-based scheme for managing elections within the Commonwealth," and it is "reasonable that the Legislature would require poll watchers, who serve within the various counties of the state, to be residents of the counties in which they serve." *Boockvar*, 238 A.3d, 2020 WL, at *30. In *Boockvar*, "heightened election fraud involving mail-in voting" was alleged but such allegation was "unsubstantiated" and "specifically belied by the Act 35 report issued by [Secretary Boockvar] on August 1, 2020." *Boockvar*, 238 A.3d, 2020 WL, at *30. The court concluded "that the poll-watcher residency requirement does not violate the state or federal constitutions." *Boockvar*, 238 A.3d, 2020 WL, at *31. In that same case, the Pennsylvania Supreme Court addressed the Commonwealth's Election Code which allows for mail-in and absentee ballots to be returned to the "county board of election," interpreting this to "permit[ ] county boards of election to accept hand-delivered mail-in ballots at locations other than their office addresses including drop-boxes." *Boockvar*, 238 A.3d, 2020 WL, at *10.

**\*5** The use of such drop-boxes does not violate federal equal-protection rights. Though every citizen has a fundamental right to vote without that vote being burdened by dilution, the Constitution grants states "broad authority to regulate the conduct of elections, including federal ones." *Ill. State. Bd. Of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983 (1979) (the right to vote is a fundamental right); *Minn. Voters Alliance v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (the right to vote includes the right to have the vote counted without dilution); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) (states have broad authority under the Constitution to regulate the conduct of elections). Though he does not explicitly connect the use of drop boxes to his equal protection claim, it appears that Bolus has concerns that when some counties use drop boxes and some do not, the voters in counties with drop boxes will be at higher risk of having their vote diluted than the voters in counties that do not utilize drop boxes. (Doc. 1, at 9-10, 18-19). While Bolus does not allege nor prove that votes cast in some counties are diluted by a greater amount than votes cast in other counties, his more fatal failure lies in the effects of any dilution. If a fraudulent ballot is cast

Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

2020 WL 6880960

through a drop box, every voter in the state will have their vote diluted equally. The legitimate votes in the counties with the drop box will not be worth less than the legitimate votes in the counties without the drop box. This holds true regardless of the relevant electoral unit: if a congressional district is made up of multiple counties and one county uses drop boxes and one does not, a fraudulent vote in the county with the drop boxes will dilute all votes, regardless of county, equally. Therefore, the Equal Protection Clause is not implicated by the use of drop boxes and other ballot collection practices. [4] *See Boockvar*, —— F. Supp. 3d ——, 2020 WL 5997680, at *41-46 (discussing this issue further).

Bolus's request that the Court enjoin Defendants from limiting poll watchers to their county of residence is also unlikely to succeed on its merits. (Doc. 1, at 20). Bolus asserts that this results in votes being cast without "procedural visibility," and that "without poll watchers, the integrity of the vote in elections is threatened and the constitutional right to free and fair public elections under the United States and Pennsylvania Constitutions is denied." (Doc. 1, at 3, 16). As mentioned *supra*, "state law, not the Federal Constitution, grants individuals the ability to serve as poll watchers and parties and candidates the authority to select those individuals." *Republican Party of Pennsylvania v. Cortés*, 218 F. Supp. 3d 396, 414 (E.D. Pa. 2016). Pennsylvania could arguably eliminate poll watchers entirely without violating the Constitution, as West Virginia already has done. *Boockvar*, —— F. Supp. 3d ——, 2020 WL 5997680, at *67 (citing W. Va. Code Ann. § 3-1-37; W. Va. Code Ann. § 3-1-41). The requirement that poll watchers reside in the county where they watch does not limit the voting choices for voters and does not make the act of voting any more difficult. Bolus's complaint fails to articulate how the residency requirement affects the process or outcome of the election, thus the alleged burden is apparently negligible. [5] The Commonwealth's rational basis for the residency requirement is that it promotes poll watchers' familiarity with the voters they are observing and increases trust among the voters. *Boockvar*, —— F. Supp. 3d ——, 2020 WL 5997680, at *72. This rational basis compels the Court to uphold the law. *Boockvar*, —— F. Supp. 3d ——, 2020 WL 5997680, at *71-72.

## C. ABSTENTION IS WARRANTED ON POLL WATCHER LOCATIONS.

**\*6** Finally, the Court must abstain from entertaining Bolus's request that poll watchers be allowed to observe wherever

absentee or mail-in ballots are returned and votes are cast, whether on or before Election Day. (Doc. 1, at 20). This request is directly related to the question of what constitutes a "polling place" under the Election Code, which is a question of state law that is currently under consideration in the Pennsylvania state courts. *Boockvar*, —— F. Supp. 3d ——, 2020 WL 5997680, at *74. [6] Therefore, under *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Court shall refrain from addressing this issue. [7]

## D. THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST BOLUS.

Looking to the remaining factors of a preliminary injunction request, the only one of the remaining three which favors Bolus is the presence of irreparable harm. *See Grill*, 908 F. Supp. 2d at 591. Whether granting preliminary relief will result in even greater harm to the nonmoving party weighs in favor of the Defendants because if the preliminary injunction were issued it would inarguably limit voting options for thousands of individuals in the midst of a public health crisis, a hardship that outweighs the vote dilution concerns presented with minimal concrete evidence. *See Grill*, 908 F. Supp. 2d at 591. For this same reason, granting the preliminary injunction would not be in the public interest. *See Grill*, 908 F. Supp. 2d at 591.

## E. THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER BOLUS'S STATE LAW CLAIMS

In addition to the claims brought pursuant to the United States Constitution, Bolus brings certain claims under the Pennsylvania state constitution. (Doc. 1). Where a district court has dismissed all claims over which it had original jurisdiction, the Court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the Court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Ordinarily, when all federal law claims have been dismissed and only state law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350, 108 S.Ct. 614. "Court have specifically applied this principle in cases raising federal and state

Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

Case 1:24-cv-01003-DFB    Document 28-1    Filed 10/29/24    Page 6 of 29

2020 WL 6880960

constitutional challenges to provisions of the state's election code." *Boockvar,* —— F. Supp. 3d ——, 2020 WL 5997680, at *75 (collecting cases). Therefore, it is recommended that a preliminary injunction not be granted on state law grounds.

## III. RECOMMENDATION

**\*7** Based on the foregoing, it is recommended that Plaintiff's Request for a Preliminary Injunction (Doc. 1, at 19-20) be **DENIED**. [8]

### NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **October 27, 2020**.

Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file

with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6880960

## Footnotes

[1]    A complaint containing a request for an injunction is effective, despite the absence of an independent motion. *See Chavis v. U.S.,* 597 F. App'x 38, 41 (3d Cir. 2014) (reaching the merits of a request for a "preliminary injunction" in the complaint); *Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Development,* 284 F.Supp. 809, 815 (E.D. Pa. 1968) (construing complaint's request for "such relief as justice and equity require" as a request for preliminary injunctive relief, and granting it).

[2]    The Supreme Court has also held that a taxpayer who sued to collect CIA expenditures – alleging injury in the form of an inability to follow the actions of Congress or the Executive resulting in an inability to perform his role as a member of the electorate in intelligently voting for candidates seeking national office – lacked standing. *United States v. Richardson,* 418 U.S. 166, 176, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974). The Court

Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)

2020 WL 6880960

explained that standing was lacking because "the impact on him is plainly undifferentiated and 'common to all members of the public.' " *Richardson*, 418 U.S. at 176-77, 94 S.Ct. 2940.

3    The only instance of potentially fraudulent conduct Bolus alleges is when nine ballots were found discarded *at the Luzerne County Bureau of Elections*. (Doc. 1, at 3). This does not support his claim that ballots should only be returned to the offices of the county board of election so as to prevent fraud.

4    Even if unequal treatment were established, the Court must exercise caution in second-guessing the decision of the Pennsylvania legislature to authorize a mail-in voting system which left room for counties to authorize drop boxes and other satellite locations for returning ballots. *Boockvar*, ––– F. Supp. 3d –––, 2020 WL 5997680, at *50-51 (citing *Boockvar*, 238 A.3d, 2020 WL, at *9). Bolus's claim of dilution is outweighed by the Commonwealth's "interests in administering a comprehensive county-based mail-in ballot plan, while both promoting voting and minimizing fraud." *Boockvar*, ––– F. Supp. 3d –––, 2020 WL 5997680, at *51. Thus, Bolus's constitutional challenge would fail under the *Anderson-Burdick* framework. *Boockvar*, ––– F. Supp. 3d –––, 2020 WL 5997680, at *51.

For these same reasons, any substantive due process claim must fail. (Doc. 1, at 8-9). State election procedures can be challenged on substantive due process grounds only in limited circumstances. *Nolles v. State Comm. for Reorganization of Sch. Districts*, 524 F.3d 892, 898 (8th Cir. 2008). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Miller v. City of Phila.*, 174 F.3d 368, 375 (3d Cir. 1999) (cleaned up). Bolus's challenge does not rise to the level of a substantive due process violation. *See Boockvar*, ––– F. Supp. 3d –––, 2020 WL 5997680, at *51 ("Based on the slight burden imposed here, and the Commonwealth's interests in their overall county specific voting regime, which includes a host of other fraud-prevention measures, the Court finds that the drop-box claim falls short of the standard of substantive due process.").

5    As to the residency requirement, the Complaint merely states,

Defendants, through their haphazard administration of Act 77, have burdened voters, candidates, and political committees with the arbitrary and illegal preclusion of poll watchers from being present in all locations where votes are being cast because ... the poll watcher may only serve in the county of their residence under Election Code Section 417(b), 25 P.S. § 2687(b). The result is that a significant portion of votes for elections in Pennsylvania are being cast in a fashion that denies any procedural visibility.

(Doc. 1, at 3).

6    Though the Court is unable to locate the status of this lawsuit, there is no indication that the case has been resolved since October 10, 2020, when *Boockvar* was signed. *Boockvar*, ––– F. Supp. 3d –––, 2020 WL 5997680.

7    "[Under *Pullman*, federal courts abstain] if (1) doing so requires interpretation of 'unsettled questions of state law'; (2) permitting resolution of the unsettled state-law questions by state courts would 'obviate the need for, or substantially narrow the scope of adjudication of the constitutional claims'; and (3) an 'erroneous construction of state law would be disruptive of important state policies[.]' " *Chez Sez III Corp. v. Township of Union*, 945 F.2d 628, 631 (3d Cir. 1991). If all three requirements are met, then the federal court must make a discretionary determination as to whether abstention is appropriate based on the weight of these factors and other relevant circumstances. *Chez Sez III*, 945 F.2d at 631.

8    When a request for a preliminary injunction can be resolved on legal grounds alone, an evidentiary hearing is unnecessary. *Beberman v. United States Dept. of State*, 675 F. App'x 131, 135 (3d Cir. 2017).

**Bolus v. Boockvar, Not Reported in Fed. Supp. (2020)**

Case 1:24-cv-01003-DFB    Document 28-1    Filed 10/29/24    Page 8 of 29

2020 WL 6880960

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GUY RESCHENTHALER**, *et al.*, | : | **CIVIL ACTION NO. 1:24-CV-1671** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **AL SCHMIDT**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

On September 30, 2024—36 days before this November's general election—plaintiffs, Republican members of Pennsylvania's congressional delegation,[1] sued Al Schmidt, Secretary of the Commonwealth, and Jonathan Marks, Deputy Secretary for Elections and Commissions, in their official capacities as administrators of Pennsylvania's elections. Plaintiffs seek declaratory and injunctive relief "to ensure legal compliance with federal and state law regarding the verification of voter registration applicants' identity and eligibility before accepting and counting ballots from" anyone casting a ballot under the auspices of the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301 *et seq.* (<u>See</u> Doc. 23 ¶ 2). The Secretary now moves to dismiss plaintiffs' lawsuit. We will grant the Secretary's motion.

---

[1] Plaintiffs originally included Congressmen Guy Reschenthaler, Dan Meuser, Glenn "G.T." Thompson, Lloyd Smucker, and Mike Kelly. Congressman Scott Perry and the group PA Fair Elections were added by amended complaint.

I.      **Factual Background & Procedural History**

A.      **UOCAVA, HAVA, and UMOVA**

This matter concerns the interplay between Pennsylvania's election laws and two federal statutes.  UOCAVA, among other things, obliges states to "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot" in all elections for federal office. 52 U.S.C. § 20302(a)(1).[2]  The states must "accept and process . . . any otherwise valid voter registration application and absentee ballot application from" a covered voter if it is received at least 30 days before an election.  Id. § 20302(a)(2).  The Act also requires the states to establish procedures to enable covered voters to request and receive voter registration and absentee ballot applications by mail or electronically, id. § 20302(a)(6)(A)-(B), and to transmit "blank absentee ballots" to eligible voters "by mail and electronically," id. § 20302(a)(7); see also id. § 20302(f).

A different federal statute, the Help America Vote Act ("HAVA") of 2002, 52 U.S.C. § 21081 *et seq.*, imposes certain election procedures upon the states pursuant to Congress's constitutional authority to regulate federal elections.  See U.S. CONST. art. I, § 4.  The states are required, *inter alia*, to build computerized

---

[2] UOCAVA defines "absent uniformed services voter" as "a member of a uniformed service on active duty," "a member of the merchant marine," or their spouse or dependent who, for service-related reasons, is absent from the place where they otherwise are qualified to vote.  See 52 U.S.C. § 20310(1)(A)-(C).  An "overseas voter" includes all of the above along with anyone who resides outside of the United States and is qualified or would be qualified (but for their residence) to vote in the last place in which they were domiciled before leaving the country.  See id. § 20310(5)(A)-(C).

2

voter registration systems and to implement minimum requirements for voters who register by mail.  See generally 52 U.S.C. § 21083.  They must adopt "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns" each one "a unique identifier."  See id. § 21083(a)(1)(A).  And they must also regularly "perform list maintenance" to remove ineligible voters.  See id. § 21083(a)(2).

Relevant here, HAVA provides that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" (a) the applicant's current and valid driver's license number or (b) the last four digits of the applicant's social security number.  See id. § 21083(a)(5)(A)(i)(I)-(II).  Applicants who have not been issued either of those numbers may still register, but they must be assigned an identification number for registration purposes.  See id. § 21083(a)(5)(A)(ii).  HAVA ultimately leaves it to each state to "determine whether the information provided by an individual is sufficient to meet [the foregoing] requirements . . ., in accordance with State law."  See id. § 21083(a)(5)(A)(iii).

HAVA also creates special rules for voters who register to vote by mail but who did not previously vote in a federal election in that state or who did not previously vote in an election in a jurisdiction located in a state that does not maintain a computerized list that complies with the Act (i.e., "federal voters").  See id. § 21083(b)(1)(A)-(B).  If those voters vote in person, they must present to an

3

appropriate state or local election official a current and valid photo ID or "a copy of

a current utility bill, bank statement, government check, paycheck, or other

government document that shows" their name and address.  See id.

§ 21083(b)(2)(A)(i)(I)-(II).  If they vote by mail, they must submit with their ballot a

copy of their current and valid photo ID or of one of the other approved documents.

See id. § 21083(b)(2)(A)(ii)(I)-(II).  However, these special rules "shall not apply in

the case of a person . . . who is entitled to vote by absentee ballot under" UOCAVA.

See id. § 21083(b)(3)(C)(i).

In 2012, the Commonwealth of Pennsylvania complied with UOCAVA's

mandates by adopting the Uniform Military and Overseas Voters Act ("UMOVA"),

25 PA. CONS. STAT. § 3501 et seq.  UMOVA effectively extended UOCAVA's

procedures for absentee voting in federal elections to state and local races, with

some slight differences designed to expand the class of eligible voters.  See id.

§ 3502.[3]  Covered voters who are registered to vote in Pennsylvania "may apply for a

military-overseas ballot using either the absentee ballot application provided under

the [Commonwealth's] Election Code or the Federal postcard application."  See id.

§ 3506(a).  Unregistered covered voters may use the federal postcard application

("FPCA") to simultaneously register to vote and to apply for a military-overseas

ballot.  See id. § 3506(b).  Applications may be submitted electronically or by mail

---

[3] UMOVA does not apply to "federal voters," that is, voters who are only
eligible to vote in federal elections because they do not satisfy the Commonwealth's
eligibility requirements for state and local elections.  See 25 PA. CONS. STAT. § 3502
(defining "covered voter").

"at any time before an election." See id. §§ 3506(c), 3507(a). Like HAVA, Pennsylvania's Election Code exempts qualified absentee voters from having to "provide proof of identification" to ensure that their ballot is canvassed "if the elector is entitled to vote by absentee ballot under" UOCAVA. See 25 PA. STAT. AND CONS. STAT. ANN. § 3146.8(i).

> ### B.     Plaintiffs' Challenge

Plaintiffs assert that Pennsylvania law requires UOCAVA applicants to "satisf[y] the voter eligibility requirements of the Commonwealth," including its residency requirements. (See Doc. 23 ¶ 6 (quoting 25 PA. CONS. STAT. § 3502)). In their view, the Election Code contemplates rejecting UOCAVA applications if an "omission" on the application "prevents election officials from determining whether the UOCAVA applicant is eligible to vote." (See id. ¶ 7 (citing 25 PA. CONS. STAT. § 3515(a)(1))). Plaintiffs aver that county election officials must "ascertain from the information on [an absentee ballot] application, district register or **from any other source** that such applicant possesses all the qualifications of a qualified elector other than being registered or enrolled." (See id. ¶ 8 (quoting 25 PA. STAT. AND CONS. STAT. ANN. § 3146.2b(b)) (plaintiffs' emphasis)).

Plaintiffs contend that the Pennsylvania Department of State has "issued directives and guidance to county officials to exempt UOCAVA applicants entirely from any verification requirements." (See id. ¶ 9). They cite Deputy Secretary Marks' testimony before the General Assembly in September 2022 that UOCAVA voters "are specifically exempted from the HAVA verification requirements. So they do not have to provide the PennDOT ID or last four of SSN. That's an

exemption both in federal law and I believe state law as well.  So there's no

systematic verification."  (See id. ¶¶ 10-11 (quoting Doc. 23-2 (9/14/22 State Gov't

Comm. Hr'g Rec. 00:59:45-1:00:11))).  They also cite the Department's October 2023

"Pennsylvania Military and Overseas Voters Guidance," which expresses "[t]he

Department's position . . . that covered voters are exempt from the Election Code's

ID requirements for absentee voters."  (See id. ¶¶ 12-13 (quoting Doc. 23-5 at 9)).

Plaintiffs believe that the Commonwealth's practice in this regard "creates an

opportunity for inclusion of ineligible ballots" that might render "the ultimate tally

of the votes" inaccurate because UOCAVA applicants theoretically could register to

vote, receive absentee ballots (including by email), and cast ballots "without

providing identification at any step in the process."  (See id. ¶¶ 17-18).  In the worst-

case scenario, plaintiffs submit that these lapses might leave federal elections

vulnerable to foreign interference via "falsified FPCAs," which might affect a close

congressional election.  (See id. ¶¶ 18-19).

      Plaintiffs raise a single count in their amended complaint, which they

characterize as "UOCAVA and HAVA Preemption" pursuant to the United States

Constitution's Supremacy Clause, U.S. CONST. art. VI, cl. 2.  (See Doc. 23 ¶¶ 173-

201).  They seek a declaratory judgment that the Department's "directives and

guidance . . . and any underlying supporting state law purportedly superseding

UOCAVA and HAVA's voter registration requirements for" verifying the identity

and eligibility of Pennsylvania UOCAVA applicants are preempted by federal law.

(See id. at 41-42 ¶ 1).  They also request an injunction (1) barring the Secretary and

Deputy Secretary "from any further actions funding, supporting, or facilitating the

directives and guidance"; (2) "instructing Defendants to provide directions to

county election officials on the legally mandated procedures to comply with federal

and state law in upcoming elections by requiring verification of" UOCAVA

applicants' identities and eligibility, including state residency requirements, "prior

to accepting and counting the UOCAVA ballots"; and (3) "requiring county election

officials to segregate UOCAVA ballots returned for the 2024 election until the

identity and eligibility of the applicant can be verified as required under HAVA and

state law." (See id. at 42 ¶¶ 2-4).

### C.    Procedural History

Plaintiffs filed a motion for temporary restraining order and preliminary

injunction, a supporting brief, and various exhibits contemporaneously with their

complaint, which they then amended with leave of court on October 7, 2024.  By

that date, Pennsylvania authorities had already transmitted more than 25,000

UOCAVA ballots to their intended recipients ahead of the November 5, 2024,

general election.  (See Doc. 23 ¶ 20).  As time was of the essence, we established an

expedited schedule for motions practice.  We also permitted the Democratic

National Committee and the Pennsylvania Democratic Party to intervene over

plaintiffs' opposition.  And we granted *amici* status to three organizations whose

views align with plaintiffs', as well as several groups of nonpartisan, nonprofit

organizations who represent the interests of military and overseas voters, along

with individual overseas voters who are registered to vote in Pennsylvania and thus

have a unique interest in the outcome of this litigation.

The Secretary moved to dismiss plaintiffs' amended complaint on October 11, and he and the intervenors filed briefs in support of dismissal that same day.[4] We held oral argument on the parties' motions on October 18, during which plaintiffs' counsel notably walked back their request for injunctive relief, limiting their prayer to "a prospective declaratory judgment," with the expectation that the parties would then "meet and confer over what would be an appropriate resolution." (See 10/18/24 Hr'g Tr. 21:2-23:3).[5]  The motions are fully briefed and ripe for disposition.

## II.   Legal Standard

### A.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.  See FED. R. CIV. P. 12(b)(1).  Such jurisdictional challenges take one of two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not within the court's jurisdiction.  Lincoln

---

[4] Intervenors filed a consolidated brief in opposition to plaintiffs' motion and in support of a motion to dismiss, (see Doc. 29); however, they never filed a formal dismissal motion of their own and did not expressly tie their brief to the Secretary's motion.  Nonetheless, defendants and intervenors raise the same grounds for dismissal; for simplicity, we will refer to them collectively as "defendants" when discussing their arguments.

[5] In the interest of expediency, the court reporter has provided the court with a rough transcript of the October 18 hearing.  Pagination of the rough transcript may vary from pagination of the official transcript.

Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's burden to establish jurisdiction.  See Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

Courts may grant a Rule 12(b)(1) motion based on the legal insufficiency of a claim only when it appears with certainty that assertion of jurisdiction would be improper.  See Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).  When assessing a facial attack, the court applies the same standard of review as when assessing a motion to dismiss under Rule 12(b)(6).  See Const. Party of Pa. v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014) (citing In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)).  Courts reviewing facial challenges "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  See Gould Elec. Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) (citing Mortensen, 549 F.2d at 891; Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

**B.  Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.  See FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."

Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker

v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  In addition to

reviewing the facts contained in the complaint, the court may also consider

"exhibits attached to the complaint, matters of public record, [and] undisputedly

authentic documents if the complainant's claims are based upon these documents."

Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit, 998 F.2d

at 1196).

    Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

10

## C.    Rule 12(b)(7)

Federal Rule of Civil Procedure 12(b)(7) provides for dismissal of a complaint for "failure to join a party under Rule 19."  FED. R. CIV. P. 12(b)(7).  Rule 19 promulgates the circumstances in which the joinder of an absent party is necessary and, if such joinder is not feasible, the considerations for assessing whether the absent party is indispensable to the action.  See FED. R. CIV. P. 19; see also Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 107 (1968); Shetter v. Amerada Hess Corp., 14 F.3d 934, 937-38 (3d Cir. 1994).  The moving party bears the burden of showing that the absent party is a required party and thus dismissal is proper under Rule 12(b)(7).  See Disabled in Action v. Se. Pa. Transp. Auth., 635 F.3d 87, 97 (3d Cir. 2011).  As with the other bases for dismissal, the court must accept the truth of the allegations in the complaint and view them in the light most favorable to the non-moving party.  See Polygon U.S. Corp. v. Diversified Info. Technologies, 3:12-CV-0923, 2012 WL 5379168, at *4 (M.D. Pa. Oct. 31, 2012) (citing Cummings v. Allstate Ins. Co., No. 11-2691, 2011 WL 6779321, at *3 (E.D. Pa. Dec. 27, 2011)).  Under Rule 12(b)(7), however, the court may also consider relevant evidence outside the pleadings.  See id.

## III.   **Discussion**

Defendants raise several preliminary grounds for dismissal.  They contend that the lawsuit was brought too late, that plaintiffs lack standing to bring this type of claim and failed to sue the proper parties, and that no cause of action exists to sustain the challenge regardless.  (See Doc. 29 at 8-17; Doc. 30 at 7-14, 17-21).  We agree with each of the defendants' arguments for dismissal.

11

### A.    Laches and <u>Purcell</u>

Defendants invoke two distinct doctrines in contesting the timeliness of plaintiffs' challenge.  The first is laches, "an equitable doctrine that bars relief when a complaining party is guilty of want of due diligence in failing to promptly institute an action to the prejudice of another."  <u>Kelly v. Commonwealth</u>, 240 A.3d 1255, 1256 (Pa. 2020) (*per curiam*) (quoting <u>Stilp v. Hafer</u>, 718 A.2d 290, 292 (Pa. 1998)).  To successfully raise a laches defense, a defendant must show inexcusable delay in bringing the lawsuit and resulting harm.  <u>See</u> <u>Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123, 138 (3d Cir. 2005).

The second doctrine is the <u>Purcell</u> principle, pursuant to which federal courts refrain from altering or interfering with the states' election rules and procedures on the eve of an election.  <u>See</u> <u>Purcell v. Gonzalez</u>, 549 U.S. 1 (2006) (*per curiam*); <u>see also</u> <u>Republican Nat'l Comm. v. Democratic Nat'l Comm.</u>, 589 U.S. 423, 424 (2020) (*per curiam*); <u>Merrill v. Milligan</u>, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring) (collecting cases).  <u>Purcell</u> urges judicial restraint as election day approaches to avoid confusing voters and election administrators alike.  <u>See</u> <u>Democratic Nat'l Comm. v. Wis. State Legislature</u>, 141 S. Ct. 28, 30-31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay); <u>Kim v. Hanlon</u>, 99 F.4th 140, 160 (3d Cir. 2024).  By discouraging "last-minute litigation," courts protect the states' dual interests "in running [] orderly, efficient election[s] and in giving citizens (including the losing candidates and their supporters) confidence in the [elections'] fairness."  <u>Wis. State Legislature</u>, 141 S. Ct. at 31 (Kavanaugh, J.).

12

No matter the label—"laches, the <u>Purcell</u> principle, or common sense"—courts "will not disrupt imminent elections absent a powerful reason for doing so." <u>See</u> <u>Crookston v. Johnson</u>, 841 F.3d 396, 398 (6th Cir. 2016).  Plaintiffs offer none. Pennsylvania adopted UMOVA in 2012.  <u>See</u> Act of Oct. 24, 2012, P.L. 1490, No. 189. Deputy Secretary Marks testified before the General Assembly about the State Department's procedures for military-overseas voters on September 14, 2022.  (<u>See</u> Doc. 23-2 (9/14/22 State Gov't Comm. Hr'g Rec.)).  And the Department issued its disputed guidance just twelve days later, revising the document slightly in September and October 2023.  (<u>See</u> Doc. 23-5 at 9).  The individual plaintiffs—each of whom successfully sought federal office several times after the relevant statutes took effect, including at least once since the guidance issued—provide no good excuse for waiting until barely a month before the election to bring this lawsuit.

When asked at oral argument why plaintiffs delayed bringing the instant challenge for more than two years after the State Department promulgated its guidance, plaintiffs' counsel initially responded that the United States Department of Justice had recently unsealed a three-year-old indictment of several Iranians for election interference.  (<u>See</u> 10/18/24 Hr'g Tr. 14:6-20).  Plaintiffs found that indictment, which was unsealed on September 27, 2024, to be "very concerning" given "the past history of the Iranians having knowledge of how to exploit the UOCAVA voting system, the FPCA, . . . [and] the federal write-in absentee ballots." (<u>See</u> <u>id.</u> at 14:6-20; <u>see also</u> Doc. 23 ¶ 172 (asserting that "Iranian nationals . . . demonstrated that bad actors could easily create and submit falsified FPCAs" to interfere with Pennsylvania's federal elections)).  But that charging document

reveals no vulnerabilities on the Commonwealth's part.  Indeed, the indictment

plainly states that a video "purport[ing] to depict an individual hacking into state

voter websites and then using that illicitly obtained voter information to create

fraudulent [military-overseas] absentee ballots" was a "simulated intrusion" that

did not involve a bona fide state or federal website, adding that the Federal Voting

Assistance Program "could not be leveraged in the manner implied by" the video.

See United States v. Kazemi, No. 1:21-CR-644, Doc. 2 ¶ 5 (S.D.N.Y. Oct. 21, 2021)

(unsealed indictment).  Pressed for anything that might corroborate whether

"there's been some Iranian influence over *Pennsylvania's* overseas ballots," counsel

effectively conceded that all he had was "concerns."  (See 10/18/24 Hr'g Tr. 14:21-

15:1 (emphasis added)).  Plaintiffs cannot rely on phantom fears of foreign

malfeasance to excuse their lack of diligence.

     The disputed guidance, in which the Department unambiguously declared its

official "position" that military-overseas voters "are exempt from the Election

Code's ID requirements for absentee voters," (see Doc. 23-5 at 9), was publicly

available on the Department's website long before September 27, 2024.  That fact

defeats plaintiffs' alternative suggestion that their delay was due to the

Department's failure to "give public notice" of the guidance, which counsel asserted

necessitated a "hard-nosed investigation" before plaintiffs could discover "this

problem in the Pennsylvania election system."  (See 10/18/24 Hr'g Tr. 15:2-25).

A simple Google search might have saved them the time and effort.  See

https://www.pa.gov/content/dam/copapwp-pagov/en/dos/resources/voting-and-

elections/directives-and-guidance/2023-Pennsylvania-Military-Overseas-Voters-Guidance-2.1.pdf.

As far as prejudice is concerned, the relief plaintiffs desire is a nonstarter. In their amended complaint, plaintiffs sought an order directing the county boards of elections to segregate ballots for potential exclusion and to impose new verification procedures the contours of which plaintiffs themselves have been unable to fully flesh out three weeks into this litigation. (See Doc. 23 at 42 ¶¶ 3, 4). An injunction at this late hour would upend the Commonwealth's carefully laid election administration procedures to the detriment of untold thousands of voters, to say nothing of the state and county administrators who would be expected to implement these new procedures on top of their current duties. Intervenors, who ostensibly represent Democratic military-overseas voters whose votes likely would be threatened, along with party-backed candidates whose prospects might depend on those votes, advance a compelling case for avoiding eleventh-hour tinkering with the Commonwealth's election machinery. The parties and their candidates almost certainly would have to expend vital resources between now and November 11, 2024, the last day for non-military-overseas absentee and mail-in voters in Pennsylvania to submit proof of identification, see 25 PA. CONS. STAT. § 3146.8(h)(2)-(3), to identify and track down affected voters living overseas, educate them about the court's decision, and encourage them to follow up with their respective counties if they want their ballots to count, thereby potentially delaying certification of scores of elections while legal challenges play out. But we need not tempt fate.

Plaintiffs' preferred remedy would hamstring election administrators less than two weeks before the general election and "lead to voter confusion," Kim, 99 F.4th at 160, especially among those covered voters who relied upon public officials' guidance and assurances when registering and casting absentee ballots from abroad.  Laches and Purcell are tailor-made for situations like this one.  See New Pa. Project Educ. Fund v. Schmidt, No. 112 MM 2024, 2024 WL 4410884, at *1 (Pa. Oct. 5, 2024) (per curiam) (declining to "impose []or countenance substantial alterations to existing laws and procedures during the pendency of an ongoing election") (citing Purcell and Crookston, 841 F.3d at 398); see, e.g., West v. Pa. Dep't of State, No. 2:24-CV-1349, 2024 WL 4476497, at * (W.D. Pa. Oct. 10, 2024) (applying Purcell to deny motion for temporary restraining order and preliminary injunction filed 41 days before general election); Mich. Republican Party v. Benson, No. 24-165, at *12-15 (Mich. Ct. Cl. Oct. 21, 2024) (rejecting last-minute challenge to UOCAVA voters on laches grounds in light of "extreme prejudice" that would result).  We will grant defendants' motion to dismiss on this basis.

## B.      Standing and Indispensable Parties

Defendants next dispute plaintiffs' standing to even bring this lawsuit. Article III of the United States Constitution limits federal court jurisdiction to "cases" or "controversies."  U.S. CONST. art. III, § 2.  To establish Article III standing, a plaintiff must demonstrate that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  For injuries in fact, "a plaintiff must show that he or she

16

suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Id. at 339. Particularized injuries "affect the plaintiff in a personal and individual way." Id.

Defendants argue that the congressional plaintiffs failed to adequately allege how the Commonwealth's treatment of UOCAVA voters harms their electoral prospects. We agree. At bottom, plaintiffs claim that "the law . . . has not been followed," which "is precisely the kind of undifferentiated, generalized grievance" that the Supreme Court has "refused to countenance." See Lance v. Coffman, 549 U.S. 437, 442 (2007). The hypothetical concerns the individual plaintiffs raise about the impact of UOCAVA votes in their individual elections are purely speculative, so their status as candidates, without more, gets them nowhere. That they would reject a bill to exempt Pennsylvania from UOCAVA and HAVA if one were put to a vote in the United States House of Representatives, (see Doc. 23 ¶¶ 45-50), similarly is irrelevant. The Supreme Court has rejected legislative standing on analogous claims because these kinds of abstract, institutional injuries are not individualized, but affect all members of a legislative body equally. See Raines v. Byrd, 521 U.S. 811, 820-30 (1997).

As for the organizational plaintiff, PA Fair Elections, the group does not identify a single member who has been injured. But even if they had, their claim of "vote dilution" would be wholly speculative and legally inadequate as well. Our court of appeals addressed similar claims following the 2020 election and concluded that voters "lack standing to redress their alleged vote dilution" predicated upon "state actors counting ballots in violation of state election law" insofar as "that

17

alleged injury is not concrete [or] particularized for Article III purposes." See Bognet v. Sec'y Commonwealth of Pa., 980 F.3d 336, 352-54 (3d Cir. 2020), vacated as moot *sub nom.* Bognet v. Degraffenreid, 141 S. Ct. 2508 (2021); see also Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 342 (W.D. Pa. 2020))). Although the Supreme Court ultimately vacated the Bognet court's opinion, it did so only because the case became moot "while on its way" to the High Court. See Bognet v. Degraffenreid, 141 S. Ct. 2508 (citing United States v. Munsingwear, Inc., 340 U.S. 36, 39 (1950)). Bognet's standing analysis retains persuasive value.

What is more, even if the causal chain was sufficiently concrete and might lead to "inaccurate vote tall[ies]," (see Doc. 23 ¶ 184), plaintiffs' injuries are not "fairly traceable to" the State Department's guidance, nor would they be redressable in this action. Each of Pennsylvania's county boards of elections is responsible for canvassing ballots—not the Secretary. See 25 PA. STAT. AND CONS. STAT. ANN. §§ 3146.8, 3154. In fact, the Secretary "has *no authority* to order the sixty-seven county boards of election to take any particular actions with respect to the receipt of ballots." *In re* Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 Gen. Election, 241 A.3d 1058, 1078 n.6 (Pa. 2020) (emphasis added). That is why the Supreme Court of Pennsylvania regards the boards as indispensable parties when the relief sought, "if warranted, could be granted solely by and through" them. See Zimmerman v. Schmidt, --- A.3d ----, 2024 WL 4284202, at *1 (Pa. Sept. 25, 2024) (concluding that neither the Secretary nor the Department was indispensable). Failing to name each board as a defendant recently led the state Supreme Court to vacate a Commonwealth Court decision in an election case because their omission

18

left the lower court without jurisdiction.  See <u>Black Political Empowerment Project</u> <u>v. Schmidt</u>, 322 A.3d 221, 222 (Pa. 2024) (*per curiam*).

The foregoing tenets apply with equal force here.  To the extent plaintiffs persist in their request for injunctive relief, it would not redress their alleged injuries.  We cannot enjoin the Secretary to do anything that would actually affect UOCAVA ballots, more than 25,000 of which were delivered by the time plaintiffs instituted this action in late September.  (<u>See</u> Doc. 23 ¶ 20).[6]  The Secretary has no authority to direct the counties to segregate those ballots or to take steps to verify UOCAVA voters' identities.  See <u>In re</u> Canvass, 241 A.3d at 1078 n.6.  Plaintiffs' prayer for relief makes the county boards indispensable, <u>see</u> <u>Zimmerman</u>, 2024 WL 4284202, at *1, and yet plaintiffs failed to name them even after we raised this issue during our scheduling call on October 4 and granted them leave to amend.  They must now live with that strategic decision.  For these alternative reasons, we will grant the defendants' motion to dismiss on standing and indispensable-party grounds.

### C.    Cause of Action

Lastly, plaintiffs purport to bring this suit under the Supremacy Clause of the United States Constitution, U.S. CONST. art. VI, cl. 2, as well as HAVA, but neither of those sources of law affords them a private cause of action.  See <u>Armstrong v. Exceptional Child Ctr., Inc.</u>, 575 U.S. 320, 324-25 (2015) ("[T]he

---

[6] We may safely assume that number and the return rate have only grown in the interim.

Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action.") (citations and internal quotation marks omitted); Am. Civil Rights Union v. Phila. City Comm'rs., 872 F.3d 175, 184 (3d Cir. 2017) ("HAVA does not include a private right of enforcement.").  That does not mean that the rights accorded to voters by HAVA and UOCAVA are illusory or unenforceable.  Both statutes authorize the Attorney General of the United States to bring a civil action to enforce their mandates, see 52 U.S.C. § 20307(a); id. § 21111, and HAVA directs states to "establish administrative complaint procedures to remedy grievances" in connection with Subchapter III of the act, id. § 21112(a); see ACRU, 872 F.3d at 181, 184.  The lone organizational plaintiff in this matter brought an administrative complaint that currently is on appeal before the Commonwealth Court of Pennsylvania.  See PA Fair Elections v. Pa. Dep't of State, No. 1512 C.D. 2023 (Pa. Commw.).  They may not rush to federal court to attempt an end-run around that process.  The absence of a cause of action deprives this court of jurisdiction over plaintiffs' case and compels us to grant defendants' motion on this final alternative basis.

IV.    **<u>Conclusion</u>**

Plaintiffs delayed too long to file their action, they lack standing, they have

failed to join indispensable parties, and they have failed to articulate a viable cause

of action.  Hence, we will grant the Secretary's motion to dismiss plaintiffs'

amended complaint without further leave to amend, and we will deny as moot

plaintiffs' motion for temporary restraining order and preliminary injunction.  An

appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania


Dated:    October 29, 2024